Don ROBERTS, Appellant,

v.

AMOCO OIL COMPANY, Appellee.

No. 83–2329.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 15, 1984.

Filed Aug. 6, 1984.

Rehearing and Rehearing En Banc
Denied Sept. 7, 1984.

David L. Doyle, Chicago, Ill., Rita A. McConnell, Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., Jay Eaton, Nyemaster, Goode, McLaughlin, Emery & O'Brien, Des Moines, Iowa, for appellee Amoco Oil Com.

William J. Conroy, Jr., Des Moines, Iowa, for appellant.

Before LAY, Chief Judge, HEANEY and BOWMAN, Circuit Judges.

HEANEY, Circuit Judge.

Don Roberts, an Amoco service station franchisee, appeals from a district court order granting summary judgment for Amoco Oil Company. The question posed is whether an offer by a franchisor to sell its service station premises excluding the gasoline pumps, dispensers, storage tanks, piping, or other equipment constitutes a "bona fide offer" under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 et seq. We hold that such an offer is not "bona fide" as a matter of law, and reverse and remand.

## I.

We begin by outlining the facts. Because the case comes to us from a summary judgment for Amoco, we review the facts in the light most favorable to Roberts, the nonmoving party.

Roberts operated an Amoco service station franchise at 1140 Penn Avenue in Des Moines, Iowa, for fifteen years. Under the franchise agreement, he leased the service station premises from Amoco. His most recent lease had a five-year term, running from February 1, 1977, to January 31, 1982.

On August 6, 1981, Amoco sent Roberts a letter notifying him that it did not intend to renew his lease when it expired on January 31, 1982, because Amoco intended to sell the premises. Amoco advised Roberts

that it would shortly make an offer to sell the station to him. When Roberts received the letter, he contacted Amoco's area representative, Bob Williams, who informed him that Amoco's offer of sale would either contain a "petroleum exclusion clause" or exclude sale of the gasoline pumps and tanks. On September 4, 1981, Amoco sent Roberts an offer to sell the premises for $66,500. The offer specifically excluded "the gasoline pumps, dispensers, storage tanks, and piping or other equipment" from the sale.

Meanwhile, Roberts had been negotiating with a third party since June, 1981, to lease another service station located at 201 East Grand Avenue. He signed a lease for the Grand Avenue station on or about September 1, 1981. Roberts maintains that he intended at that point to operate both locations, using the Penn location for a car wash and quick lube station, while using the Grand location for a full service operation.

At any rate, Roberts wrote Amoco a letter on September 28 stating that he intended to vacate the Penn Avenue station by October 1, 1981. He did so, and on October 5, 1981, Amoco wrote him that it considered his letter and actions to be a "voluntary surrender" of the station, and was therefore terminating his lease.

Roberts then filed suit against Amoco on February 23, 1982, in federal district court in the Southern District of Iowa. Roberts alleged that Amoco's conduct violated the PMPA in that Amoco had failed to make a "bona fide offer to sell, transfer or assign its interest" in the service station premises. Amoco filed a counterclaim seeking compensation for unpaid rent and gasoline. Both parties conducted substantial discovery.

On April 18, 1983, Amoco moved for summary judgment on both Roberts' claim and its counterclaim. On September 13, 1983, the district court granted summary judgment for Amoco, ruling that there was no genuine issue of material fact concerning whether Amoco's offer was "bona fide" under the PMPA. It also granted summary judgment on Amoco's counterclaim in the amount of some $13,000.

Roberts then brought this appeal. He does not appeal the counterclaim judgment. He argues, however, that he raised a genuine factual issue concerning whether Amoco's offer was "bona fide," and that his vacation of the service station at Penn Avenue does not constitute an alternative ground for summary judgment against him.

## II.

Because this is our Circuit's first occasion to consider a case under the PMPA, and the precise issue before us is one of first impression, we review the background and purpose of the Act. The petroleum marketing franchise relationship has a history of tension and problems. In 1971, a leading commentator in the area of franchise law observed:

> In the Nation's second largest industry, the major oil firms have the gasoline station dealers in virtual bondage, hinged on the constant threat that their short-term contracts will not be renewed unless they submit to burdensome franchisor-imposed practices. * * * It is generally conceded that the gasoline station situation is almost hopeless and offers a prime example of the worst abuses in franchising.

Brown, *Franchising—A Fiduciary Relationship*, 49 Tex.L.Rev. 650, 655–657 (1971).

The financial hardship imposed on franchisees by high minimum rent and "minimum gallonage" requirements, burdensome marketing requirements which benefit the franchisor but not the franchisee, and the ease of franchise termination have forced many franchisees out of business. *See* Comment, *Retail Gasoline Franchise Terminations and Nonrenewals Under Title I of the Petroleum Marketing Practices Act*, 1980 Duke L.J. 522, 524–525 (1980). The energy crisis has worsened the situation for franchisees; increasing supply costs have led oil companies to seek higher

profits at the marketing level. *See* Note, *Petroleum Marketing Practices Act: Equalizing the Bargaining Power in the Franchise Relationship,* 25 S.D.L.Rev. 69, 69–70 (1980). As Senator Durkin observed during Senate debate of the PMPA, "[S]ince the embargo, there have been approximately 35,000 small-business people, hardworking gasoline dealers, gasoline station owners whose gasoline stations have been closed." 124 Cong.Rec. S12762 (May 5, 1978) (statement of Sen. Durkin).

Congress enacted the PMPA after investigating and considering numerous allegations that petroleum franchisors used threats of termination or nonrenewal of the franchise to compel franchisees to comply with their marketing policies. There were also numerous complaints before Congress of unfair terminations and nonrenewals for arbitrary and discriminatory reasons. These practices thus posed a threat to the independence of the franchisee as a competitive influence in the marketplace. Congress intended the PMPA to address this disparity in bargaining power. S.Rep. No. 95–731, 95th Cong., 2d Sess. 17–19, *reprinted in* 1978 U.S.Code Cong. & Ad. News 873, 875–877.

The statute seeks to protect and to effectuate the franchisee's reasonable expectations that the franchise relationship will be a continuing one. *Id.* at 18, 1978 U.S.Code Cong. & Ad.News at 876. It regulates the conditions and grounds for which a franchisor may terminate or not renew a franchise. *See* 15 U.S.C. § 2802. It requires that franchisors provide advance notice of termination or nonrenewal before taking action. *Id.* The PMPA further provides franchisees with a cause of action against franchisors for violation of these provisions. *Id.* at § 2805. Relief includes a preliminary injunction and other equitable relief, as well as actual and exemplary damages and attorney and expert witness fees. *Id.*

### III.

Roberts argued below that Amoco violated the PMPA's requirements concerning nonrenewals by failing to make a bona fide offer to sell the Penn station to him when it decided to sell the premises. The district court determined that Amoco's offer of sale to Roberts was "bona fide," noting that "nothing in plaintiff's brief or the exhibits indicates that defendant's decision to sell the premises and not renew the lease was less than a good faith business decision." The court rejected Roberts' contention that the offer was not bona fide because the pumps and tanks were excluded. It accepted Amoco's suggestion that the company deducted the cost of replacing the equipment from the purchase price offered to Roberts. Finding that Roberts presented no evidence to show a genuine issue for trial on this point, the court granted summary judgment for Amoco.

Summary judgment is proper only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The issue before us is a novel one. We are aware of no other court which has had the occasion to determine whether a bona fide offer to sell the service station premises under the PMPA must include the gasoline pumps, tanks, and other related equipment. We turn first to the language of the statute itself.

The PMPA provides that a franchisor may decide to sell a service station or otherwise withdraw from a particular market area so long as the franchisor makes that determination "in good faith and in the normal course of business." 15 U.S.C. § 2802(b)(3)(D); *see also id.* § 2802(b)(2)(E). Specifically, the franchisor has "ground for nonrenewal of a franchise relationship" if it has made such a determination. But under § 2802(b)(3)(D)(iii):

in the case of leased marketing premises such franchisor, during the 90-day period after notification [of nonrenewal to the franchisee] [must] either—

(I) [have] made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

The term "leased marketing premises" is defined in § 2801(9) as "marketing premises owned, leased, or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel."

■ The district court did not consider this statutory definition in its opinion. The language is quite clear, however, in its application to this case. Gasoline pumps, storage tanks, and dispensers are certainly "employed in connection with the sale, consignment, or distribution of motor fuel." When Congress required a franchisor to make a bona fide offer to sell the leased marketing premises to its franchisee, Congress certainly intended the offer to include more than the real property. It explicitly required that the offer include the property controlled by the franchisor and used by the franchisee to distribute motor fuel.

■ The suggestion that Amoco's offer was bona fide because the cost of replacing the equipment was deducted from the price cannot justify summary judgment for Amoco. The evidence in the record reveals a genuine factual issue concerning the value of the service station with and without the equipment. But more importantly, even if there was no contradictory evidence on this point, the statute clearly dictates that an offer excluding the pumps and tanks cannot be considered bona fide.

The broader purposes of the PMPA also require this interpretation. Congress's concerns for remedying the disparity of bargaining power between franchisors and franchisees, for eliminating unfair franchise terminations and nonrenewals, and for preserving the competitive influence of independent franchisees in the marketplace would each be defeated by allowing a franchisor to exclude the gasoline distribution equipment from an offer of sale to a franchisee. To affirm the district court's interpretation would create a loophole in the statute. It would allow franchisors undue bargaining leverage, and could lead to unfair or discriminatory franchise nonrenewals, thereby contributing to a further decrease in the number of independent franchisees. Congress certainly did not intend such a result.

■ It is important to distinguish the question of whether Amoco's offer of sale to Roberts was "bona fide" from the question of whether Amoco's decision not to renew Roberts' lease was "in good faith and in the normal course of business." Although "bona fide" is simply Latin for "good faith," there are two separate inquiries involved here under the PMPA. A franchisor has a right under the PMPA not to renew a franchise and sell the service station premises so long as that decision is in good faith and in the normal course of business. The legislative history indicates that Congress wanted franchisor nonrenewal and termination decisions to meet a two-pronged test. The "good faith" prong is intended "to preclude sham determinations from being used as an artifice for termination or nonrenewal." S.Rep. No. 95-731, 95th Cong., 2d. Sess. 37, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 895-896. The "normal course of business" prong is Congress's way to avoid the second-guessing of a business judgment to withdraw from a market or otherwise change marketing strategy. *Id.* There are a number of cases evaluating franchisor decisions under this part of the PMPA, and they generally require only a "good heart" or subjective good faith from the franchisor. *See, e.g., Meyer v. Amerada Hess Corp.*, 541 F.Supp. 321, 330 (D.N.J.1982); *Palmieri v. Mobil Oil Corp.*, 529 F.Supp. 506, 509-511 (D.Conn.), *aff'd*, 682 F.2d 295 (2d Cir.1982); *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1118-1121 (D.Conn.1980). For example, a franchisor's decision to require a large rent increase has been held permissible under this subjective good faith standard without regard to the objective

reasonableness of the increase. *Munno v. Amoco Oil Co., supra,* 488 F.Supp. at 1118–1120. This result has been criticized, *see* Note, *Judicial Interpretation of the Petroleum Marketing Practices Act: Conflict and Diversity,* 32 Emory L.J. 273, 314–315 (1983), and at least one court has held that a franchisor's bad faith can be inferred from the reasonable consequence of the rent hike. *Tiller v. Amerada Hess Corp.,* 540 F.Supp. 160, 165–166 (D.S.C. 1981); *see also Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380, 1390–1391 (10th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982).

■ In the instant case, however, Amoco's decision not to renew Roberts' lease and to sell the Penn Avenue service station is not at issue. The separate inquiry of whether Amoco's offer of sale to Roberts was "bona fide" may certainly involve notions of subjective good faith, but a "bona fide offer to sell" the service station premises has been objectively defined in the PMPA. Assuming that Amoco decided in good faith and in the normal course of business to sell the station, it is not excused from its failure to offer Roberts the property necessary for selling motor fuel on the premises as required by the PMPA. Section 2802(b)(3)(D)(iii) requires that franchisees have an opportunity to continue in business by purchasing the entire premises used in selling motor fuel. Thus, any general business judgments underlying the terms of the offer, such as Amoco's alleged concern for avoiding future liability or environmental damage arising from leaking storage tanks, do not make an otherwise deficient offer "bona fide."

■ Amoco also contends that its offer of sale must be accepted as bona fide by the court because Roberts never made a counteroffer. Section 2802(b)(3)(D), however, does not place any such obligation on the franchisee. It places the sole obligation on the franchisor to make a bona fide

offer. Roberts' decision not to respond to Amoco did nothing to relieve Amoco of this obligation.

We thus find that summary judgment for Amoco on this issue was erroneous. We hold as a matter of law that a bona fide offer to sell leased marketing premises under the PMPA must include the gasoline pumps, storage tanks, dispensers, and other equipment used in distributing motor fuel.[1] Amoco also contends that summary judgment was alternatively proper because Roberts vacated the Penn Avenue station, on October 1, 1981, giving Amoco a proper ground for terminating the lease. We turn next to this contention.

**IV.**

■ Assuming that Amoco had a proper ground to terminate Roberts' lease, nothing in the PMPA indicates that Roberts thereby lost his action for damages against Amoco based on its failure to make a bona fide offer. In fact, the PMPA provides that franchisees may still pursue their claims for damages even when a franchisor has successfully raised an equitable defense. Section 2805(e) provides that a franchisor may raise its good faith business decision not to renew a franchisee's lease as an equitable defense to the franchisee's claim for permanent injunctive relief. But the statute expressly states that the franchisor is nonetheless liable for damages to the franchisee caused by the franchisor's violation of section 2802's requirements governing termination and nonrenewal. We read this section of the PMPA to reflect Congress's balancing of franchisor and franchisee interests. Congress did not intend to force the continuation of a franchise relationship where the franchisor had made a good faith business decision to sell the premises or otherwise alter its marketing strategy. On the other hand, the franchisor may not escape liability for the damage it causes to the franchisee in failing to comply with section 2802.

1. We are not faced in this case with a conflict between the franchisee's right to a bona fide offer and the franchisor's interest in protecting its trademark and good will associated with certain signs or shapes of articles on the premis-

es. Our holding does not preclude a franchisor's offer of sale from providing for re-labeling or otherwise modifying the marketing premises to protect the franchisor's trademark.

608

■ In this case, even if Amoco had a right to terminate Roberts' lease when he vacated the station, this cannot serve as a basis for dismissing Roberts' damages claim on a motion for summary judgment, although the timing of his departure may be relevant to the measure of damages. Roberts may thus pursue at trial his claim for damages, if any, caused to him by Amoco's failure to make a bona fide offer of sale.

Summary judgment on this point is also improper because Roberts raised a genuine issue for trial concerning Amoco's right to terminate the lease. Section 2802(b)(2)(C) of the PMPA provides in pertinent part that a franchisor may terminate a franchise upon "[t]he occurence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise * * * is reasonable." The PMPA lists certain such "events" which are per se grounds for termination. The list includes:

failure by the franchisee to operate the marketing premises for—

(A) 7 consecutive days, or

(B) such lesser period which under the facts and circumstances constitutes an unreasonable period of time.

15 U.S.C. § 2802(c)(9).

"Failure" under the PMPA specifically excludes "any failure for cause beyond the reasonable control of the franchisee." *Id.* at § 2801(13)(B).

Here, Amoco argues that Roberts gave it the right to terminate the franchise when he wrote Amoco on September 28 stating that he intended to vacate the Penn Avenue station by October 1, and then did so. Amoco waited four days before it wrote Roberts telling him it considered the service station "voluntarily surrendered." Amoco stressed that a four-day period was sufficient to allow termination under section 2802(c)(9)(B) because of Roberts' stat-

ed intention not to return to operations at Penn Avenue.

The issue boils down to whether Roberts offered proof showing that his vacation of the premises was "for a cause beyond [his] reasonable control." We think he sufficiently raised a genuine factual issue concerning whether Amoco's exclusion of the pumps and tanks from its offer of sale caused him to leave the station out of practical business necessity. To be sure, Roberts entered into his lease at the Grand Avenue station before he received Amoco's written offer. But in his deposition, Roberts stated that an Amoco representative orally informed him prior to his signing the Grand Avenue lease that Amoco's offer of sale would either exclude the gasoline pumps and tanks or prohibit sale of petroleum at the site altogether. This deposition testimony creates a factual issue sufficient to survive summary judgment. Roberts should be able to go to trial on whether leaving the Penn Avenue station was for a cause beyond his reasonable control. We note that the PMPA's specific qualification of the term "failure" in section 2801(13) and the legislative history of the Act discussed *supra* thoroughly document Congress's concern with the excessive bargaining power with which franchisors have forced franchisees out of business. Congress explicitly addressed this imbalance of bargaining power by insuring that a franchisee would not suffer a franchise termination due to an event or cause beyond his or her reasonable control.[2] Amoco will, of course, be free to present its case at trial that Roberts was not coerced or pressured into vacating the Penn Avenue station.

## V.

We thus conclude that the district court erred in granting summary judgment for Amoco on Roberts' claim. We hold as a matter of law that a bona fide offer to sell the service station premises to a franchisee

2. At least one court has found that a franchisor's unreasonable conduct can serve to cause a franchisee's "failure" to comply with lease terms, and thereby excuse the franchisee under section 2801(13). *Marini v. Atlantic Richfield Co.,* 475 F.Supp. 142, 144–145 (D.N.J.1979) (franchisor's pressure on franchisee to purchase motor oil he could not sell caused franchisee's arrearages, and so they cannot serve as a basis of nonrenewal or termination; franchisee entitled to preliminary injunction).

under the PMPA must include the property used in selling and distributing the gasoline, such as the pumps, storage tanks and dispensers.

We remand the case for trial so that Roberts may attempt to prove that Amoco's bad faith offer of sale caused him to vacate the premises out of practical business necessity. Roberts may also introduce evidence of actual damages pursuant to the statute. Amoco, of course, is free to present its defense concerning both whether it coerced Roberts into leaving the Penn Avenue station, and whether Roberts mitigated his damages, if any.

Reversed and remanded.