670 F.Supp. 853 (1987)
Thomas KESSLER, Plaintiff,
v.
AMOCO OIL COMPANY, Defendant.
No. 87-1036C(6).
United States District Court, E.D. Missouri, E.D.
September 28, 1987.
*854 Gregory D. Hoffmann, Francis E. Pennington, Christina A. Levison, Green, Kanefield, Hoffmann & Dankerbring, St. Louis, Mo., for plaintiff.
Gerald R. Ortballs, David M. Harris, Greensfelder, Hemker, Wiese, Gale & Chappelow, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
GUNN, District Judge.
This matter has come before the Court upon the motion of defendant Amoco Oil Company (Amoco) for summary judgment. Plaintiff Thomas Kessler (Kessler)[1] brings this action alleging that Amoco violated certain provisions of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801 et seq, when it elected not to renew Kessler's service station lease. Coincident with the commencement of this action, Kessler moved for a temporary restraining order, or preliminary injunction, to prevent Amoco from not renewing the service station lease. Following a hearing on Kessler's motion, the parties agreed to maintain the status quo pending this Court's consideration of Amoco's motion for summary judgment. Following briefing on the motion, the Court heard oral argument on July 8, 1987. Based upon all of the pleadings, affidavits, exhibits, briefs and arguments, this Court concludes that there is no genuine dispute of any material fact that Amoco has complied with PMPA's requirements when not renewing Kessler's service station lease and that it is therefore entitled to judgment in this cause as a matter of law.

FINDINGS OF FACT
Amoco is a Maryland corporation with its principal place of business in Chicago, Illinois. Its primary business is the retail distribution and sale of petroleum and petroleum-related products. This business is carried out, in part, through a large number of Amoco service stations. These service stations are typically leased to dealers, who in turn purchase petroleum and petroleum-related products from Amoco pursuant to certain agreements ancillary to a facility lease. Most such leases are for a period of three years.
Amoco manages its service station assets through two levels of control. First, station assets are supervised by district offices which are delineated by geographic boundaries. The districts are, in turn, supervised by zone offices that are also organized on broader geographic lines.
Amoco has a defined business procedure for determining whether to renew a dealer's service station lease. Sometime during the year prior to the expiration of a service station lease, Amoco evaluates the particular service station's profitability to determine whether the lease should be renewed, and if so, on what terms. The profitability of each service station is measured in accordance with its "profitability index" or "PI." The PI shows the level of profit to Amoco from each of its capital assets in terms of cash flow, adjusted to reflect the time value of money. To determine where Amoco can best apply its capital to enhance profit, a company policy has been set establishing minimum PIs that each capital asset must meet in order to be retained. For existing service stations the PI must be at least 10%.
A preliminary PI review is performed for the district. In the event the review of a service station shows a PI of less than 10%, the district will recommend a strategy, such as abandoning the station and offering it for sale to the dealer at a fair market value of the land and improvements. This recommendation is reflected on an Amoco Form 324 "Capital Asset Proposal." If the strategy calls for offering the service station for sale to the dealer, Amoco develops a fair market value for the land and improvements.
*855 Amoco's procedure to establish the fair market value requires that its representative, for the pertinent district, appraise the land. In so doing, the representative may use: (1) any offers received for the property; (2) comparable sales; or (3) third party appraisal reports. The representative is permitted to adjust the value of the land reflected in the above three sources to account for any special factors which the representative, in his or her experience, has come to find significant in determining land values.
The appraisal is then forwarded to the zone office where it is reviewed and the improvements are valued. A mathematical formula has been developed to determine the present value of improvements at Amoco's service stations which is applied to Amoco's actual cost for the improvements. When the mathematical formula renders a value to the improvements, the land value, as approved by the zone office, is added to the improvements' value to develop Amoco's composite fair market value for the service station. That composite value underlies the offer to the dealer.
Amoco owns a service station at the southwest corner of Lindbergh and Ladue Roads in Creve Coeur, Missouri. Kessler has leased the station from Amoco pursuant to a three year lease, the term of which expired as of May 31, 1987. In 1986, Amoco's St. Louis District reviewed the profitability of Kessler's service station for the purpose of determining whether to renew the lease. Utilizing the PI formula, the district found that Kessler had a PI of 7.1% based on his operations for the past three years. In addition, Amoco found that to meet the minimum PI criteria of 10%, Kessler would have to sell 1,615,000 gallons of gasoline and other fuels, an amount more than double his 1986 sales of 806,800 gallons. Further, Kessler's gasoline sales have declined over the last three years from nearly 1 million gallons in 1984 to the 806,800 gallons in 1986, almost a 20% decline. Based on the 7.1% PI, the district prepared a capital asset proposal for the station, recommending that the service station be sold to Kessler.
The Amoco representative for the St. Louis District then developed an appraisal for the property at $750,000 based on an earlier third party appraisal of the property conducted for Amoco. The appraisal was relayed to Amoco's zone office along with the capital asset proposal. At the zone office, Amoco's formula for valuing the improvements was applied to determine that the improvements were worth $276,157.
While the capital asset proposal was under review at the zone office, the Amoco representative received an offer for the service station from Gilco Construction Company (Gilco). Gilco offered $750,000 for the station with an option for it to either take only the land or the land and improvements. In the event Gilco purchased only the land, Amoco would be responsible for removing all improvements. In either event, Amoco was to pay a $75,000 commission on the sale if completed. The Amoco representative revised his appraisal of the property based on this offer and recommended to the zone office that the fair market value of the land alone was $750,000 to which the improvements value should be added.
The zone office agreed with the representative. However, in this instance, it decided to deduct the amount of the sales commission ($75,000) to arrive at the fair market value of $675,000 for the land. Based on the land value reflected in the Gilco offer, and the computation of the value of the improvements, Amoco determined that the fair market value of the land and the improvements was $951,157.
By certified mail dated February 25, 1987, Amoco advised Kessler that it was not going to renew his lease. The stated reasons for nonrenewal were as follows:
Under the requirements of the Petroleum Marketing Practices Act, you are notified that the reason for the nonrenewal is the fact that the renewal of the lease and franchise relationship is likely to be uneconomical to our company, despite any reasonable changes or additions to the contract. Specifically, the present discounted cash flow from the station is *856 below the level which the management of Amoco requires from each capital investment of the company.
By that same correspondence, Amoco also offered to sell the premises, land and all improvements, except Amoco credit card processing equipment (SVB) and Amoco signage, for $951,157.
On April 1, 1987, Gilco increased its offer for the station to $1,050,000.
Kessler rejected Amoco's offer and commenced this action challenging the nonrenewal as violative of PMPA on three grounds: (1) that the notice was deficient in that it failed to specify the reasons for nonrenewal; (2) that the decision not to renew was lacking in good faith; and (3) that the $951,157 sale offer was not bona fide.

CONCLUSIONS OF LAW

I. Introduction
By way of overview, Congress enacted PMPA for the general purpose of protecting service station dealers, or "franchisees" in the parlance of PMPA, "from arbitrary or discriminatory termination or nonrenewal of their franchises." Greco v. Mobil Oil Co., 597 F.Supp. 468, 471 (N.D. Ill.1984), quoting, S.Rep. No. 95-731, reprinted in 1978 U.S.Code Cong. and Ad. News, 873, 874. Congress perceived a general imbalance of bargaining power between service station dealers and oil companies (franchisors) with respect to the dealer's ability to continue operating a service station. See Roberts v. Amoco Oil Co., 740 F.2d 602, 605 (8th Cir.1984). To address this imbalance, PMPA specifies those permissible grounds for nonrenewing a dealer and sets forth a required procedure for effectuating nonrenewal. In the context of this matter, PMPA requires the franchisor to give the dealer 90 days written notice of nonrenewal, the reason for the nonrenewal must be one enumerated by PMPA as permissible, and the franchisor must extend a bona fide offer to sell the station to the dealer.
The standards for summary judgment for PMPA claims, as well as any other, are well established. Summary judgment can only be entered if it appears from the record that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party and that party must be given the benefit of all reasonable inferences from the facts of the case. Keys v. Lutheran Family & Children's Services of Missouri, 668 F.2d 356, 357-58 (8th Cir.1981); Vette Co. v. Aetna Casualty & Surety Co., 612 F.2d 1076, 1077 (8th Cir.1980). Each of Kessler's claims is evaluated with these standards in mind.

II. The Adequacy of Amoco's Nonrenewal Notice Under PMPA
For nonrenewal to be effective under PMPA, the franchisor[2] must give the dealer notice of nonrenewal. See 15 U.S.C. § 2802(b)(1)(A). For the notification to be effective it must, among other things, contain "a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor." 15 U.S.C. § 2804(c)(3)(A).
Notice is sufficient under this section if the reasons are adequate to apprise the dealer of his rights under PMPA. "The PMPA requires only that the franchisor articulate with sufficient particularity the basis for the decision not to renew so that the franchisee can determine his rights under the Act." Brach v. Amoco Oil Co., 677 F.2d 1213, 1226 (7th Cir.1982) (citation omitted). This means that the notice must identify the reason for nonrenewal so that the dealer can determine whether the reason is one authorized by PMPA. "While there is no obligation to parrot the statute, the notice should direct the franchisee to the section of the statute the franchisor relies upon so that the franchisor cannot conjure up another reason for *857 termination after the fact." Baldauf v. Amoco Oil Co., 553 F.Supp. 408, 416 (W.D. Mich.1981), aff'd per curiam, 700 F.2d 326 (6th Cir.1983). See also Southern Nev. Shell Dealers Ass'n v. Shell Oil Co., 634 F.Supp. 65, 68 (D.Nev.1985).
Under § 2802(b)(3)(D)(i)(IV) of PMPA, one of the authorized grounds for nonrenewal is if "[the] renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee."
In the notice of nonrenewal, the reason Amoco gave for nonrenewal was that the relationship with Kessler "is likely to be uneconomical to our company, despite any reasonable changes or additions to the contract." The notice also stated "[s]pecifically, the present discounted cash flow from the station is below the level which the management of Amoco requires from each capital investment of the company." This notice is sufficient as a matter of law. As stated in Baldauf, "parroting" the statute, as Amoco has done here, sufficiently advises Kessler of the grounds for nonrenewal, because Kessler "can readily determine the grounds Defendant relies upon and determine whether they are permissible under the Act [PMPA]." Baldauf, 553 F.Supp. at 417.
Further, Amoco's statement of its reason for nonrenewal, "the present discounted cash flow from the station is below the level which the management of Amoco requires from each capital investment of the company," constitutes a functional definition of PI. In that regard, it is undisputed that Kessler's current sales amounted to 806,500 gallons and that such amount is less than half of the volume that would be necessary to meet Amoco's standard 10% PI. No counter affidavit or other competent evidence was tendered by Kessler challenging the sufficiency of Amoco's notice. In such circumstances, summary judgment has been granted in identical situations involving other Amoco dealers who were nonrenewed for failure to meet profitability standards because of declining gallonages. See Pietras v. Amoco Oil Co., slip op. No. 84-2883 (E.D.Pa., Aug. 20, 1985); Baziz v. Amoco Oil Co., slip op. No. HM84-2474 (D.Md., Feb. 5, 1985) [Available on WESTLAW, DCT database].

III. The Appropriateness of Amoco's Nonrenewal Decision
PMPA specifically authorizes franchisors to not renew franchises that are uneconomical to the franchisor. Section 2803 requires that the determination that a franchise relation is uneconomical must be reached in "good faith and in the normal course of business" by the franchisor. See 15 U.S.C. § 2802(b)(3)(D). This is a two-pronged test requiring: (1) good faith; and (2) a determination that the decision was rendered in the normal course of business.
The "good faith" prong of the test refers to the subjective intent of the franchisor, i.e., that the real reason in not renewing the franchise was the fact that it was uneconomical. As the legislative history of PMPA makes clear:
One test is whether the determination was made in "good faith." This good faith test is meant to preclude sham determinations from being used as an artifice for termination or nonrenewal.
S.Rep. No. 95-731, reprinted in 1978 U.S. Code Cong. and Ad.News, 873, 895-96. Thus the good faith of the franchisor is evaluated by whether the stated reasons are the franchisor's actual reasons. This test requires a subjective good-faith standard. See Roberts, 740 F.2d at 606; Brach, 677 F.2d at 1222-23; Munno v. Amoco Oil Co., 488 F.Supp. 1114, 1119 (D.Conn.1980). As the franchisor's actions are measured by a subjective, rather than an objective, standard, "it is not necessary for the courts to determine whether a particular marketing strategy ... is a wise business decision." S.Rep. No. 95-731, reprinted in 1978 U.S.Code Cong. and Ad. News, 873, 896.
The second prong of the test is whether the nonrenewal decision was rendered in the normal course of the franchisor's business. Under the second prong, the legislative history requires only that the franchisor show that the nonrenewal decision *858 was the "result of the franchisor's normal decision-making process." S.Rep. No. 95-731, reprinted in 1978 U.S.Code Cong. and Ad.News, 873, 895-96. To the same effect, see also Roberts, 740 F.2d at 606; Brach, 677 F.2d at 1222; Munno, 488 F.Supp. at 1119.
In this case, Amoco applied its PI analysis to Kessler's station as a part of its normal business practice. The computerized analysis was performed in the same manner as it evaluates all of its stations. The PI for Kessler's station was well below Amoco's corporate-wide policy of 10% for service stations. Amoco had no expectation that Kessler could ever reach a 10% PI because he would have to more than double his gallonage at a time when he had experienced a three-year decline in gallons sold.
Other courts have evaluated nonrenewal decisions by Amoco based on its PI criteria. In Baziz v. Amoco Oil Co., slip op. No. HM84-2474 (D.Md., Feb. 5, 1985) [Available on WESTLAW, DCT database], Amoco's motion for summary judgment was granted based on a finding that Amoco's PI determination was rendered in good faith and in the normal course of its business:
The court finds that the good faith requirement of § 2802(b)(3)(D)(i)(IV) [sic] is satisfied where the franchisor determines in the normal course of business that a particular franchise is no longer profitable and makes that decision objectively without intent to discriminate against or take unfair advantage of a particular franchise.... In the instant case Amoco has demonstrated its good faith.
Baziz, slip op. No. HM84-2474, at 13.
Similarly, in Pietras v. Amoco Oil Co., slip op. No. 84-2883 (E.D.Pa., Aug. 20, 1985), the Court, in granting summary judgment, recognized Amoco's good faith when not renewing a franchise for failure to meet the 10% PI criteria:
It is clear that the making of the Profitability Index calculation was a part of Amoco's normal course of business, and was employed in good faith and not as a pretext for terminating a business relationship. Plaintiffs' high prices and low sales volume support the conclusion that the Profitability Index was not a pretext and, moreover, was accurate. The Court finds that defendant's decision that continuation of the relationship would be uneconomical was made in good faith and in the normal course of business.
Pietras, slip op. No. 84-2883, at 4.
Kessler makes four arguments in response, none of which is persuasive. First, he relies on allegations, unsupported by affidavits or other materials, that Amoco had some undefined ulterior motive in not renewing his franchise. However, these naked assertions that it had ulterior motives in not renewing Kessler's franchise fail to raise a triable issue of fact. As stated in Marks v. Shell Oil Co., 643 F.Supp. 1050, 1055 (E.D.Mich.1986):
... Marks has failed to demonstrate that Shell's nonrenewal of the base lease was made with evil intent. Although Marks alleges that Shell's nonrenewal was in retaliation for, among other things, her failure to purchase Shell products, Marks has produced no evidence thereof besides mere allegations. Similarly, the bare claim of sex discrimination suffers from the identical malaise....
Given the insufficiency of the dealer's contentions, the court in Marks granted Shell's motion for summary judgment. Here, moreover, Kessler has not controverted the affidavits submitted by Amoco's employees attesting to Kessler's failure to meet the PI standard as the reason for nonrenewal.
Second, Kessler argues that Amoco's nonrenewal decision was not based on the PI analysis because its zone office conducted the PI analysis in February 1987, whereas the district's nonrenewal decision was made in December 1986. From this Kessler argues that the PI analysis could not have formed the basis for Amoco's nonrenewal decision because the decision to nonrenew preceded the PI analysis.
In making this argument, Kessler relies solely on his interpretation of Amoco's affidavits and documents. However, Kessler misreads these affidavits and documents regarding the sequence of Amoco's PI review. What is overlooked is that the district requested a PI analysis in December *859 1986. The PI analysis is found on Amoco's Form 324, prepared by the district office, and recites the 7.1% PI figure and sets forth Kessler's gallonage history upon which the PI analysis was based. That the zone office later had the same analysis performed does not serve to create any dispute that in fact Amoco based the nonrenewal on its PI calculations performed in December 1986.
Kessler also directs an attack at the credibility of the district and zone PI figures by suggesting a contrivance of those figures. The basis for such contention is that the zone office reports an identical PI of 7.1% some two months after the district office. Kessler suggests that there should have been a difference in the two PI figures because they were performed at different times. But, by affidavit, credible answer is given to this challenge. The two separate PI calculations produced the same number because both analyses used the same data, i.e., gallonage sold at Kessler's location from 1984 to December 1986. Thus, the fact that the calculations were physically performed at separate times is immaterial because both used the same data base.
Kessler's third argument is that the nonrenewal is in bad faith because Amoco failed to negotiate with him for new terms to make the location economical. Specifically, Kessler argues that Amoco should have built a convenience store for him to enhance gasoline sales.
As a general proposition a franchisor has no legal duty to negotiate with a franchisee to continue a franchise once the franchisor has discharged its PMPA responsibility to evaluate the economic status of the station in good faith and in the normal course of business. See Brach, 677 F.2d at 1223; Marks, 643 F.Supp. at 1055; Pietras, slip op. No. 84-2883 at 6. As the Court in Baziz, held, "§ 2802(b)(3)(i)(IV) does not require [Amoco to] negotiate possible franchise changes or additions with a franchisee before making a nonrenewal determination, but permits a unilateral decision based on good faith and normal business practice." Slip op. No. HM84-2474, at 9. Consequently, Kessler's position is insufficient as a matter of law because PMPA imposes no duty to negotiate in these circumstances.
However, if such duty exists, the Court would still find in favor of Amoco. The convenience store that Kessler wants was the subject of a contract between the parties. It is undisputed that the parties specifically agreed that if Kessler wanted a convenience store, it was his obligation to build it at his own expense. Amoco had the right to review and approve any plans for the store, and there were no facts presented that Kessler sought to build such a store. Consequently, even if Amoco had a duty under PMPA to "negotiate in good faith" over the convenience store, the undisputed evidence is that it did so negotiate with Kessler.
Finally, Kessler argues that he was unaware that declining sales could lead to franchise nonrenewal. PMPA does not impose a duty upon the franchisor to warn the franchisee of every, or any, contingency that may lead to nonrenewal. Consequently, Amoco's right to nonrenew Kessler does not depend upon its having given advance notification to him to improve sales. If such a duty existed, however, it has been determined that knowledge of declining sales is sufficient notice as a matter of law. In Pietras, slip op. No. 84-2883 (E.D.Pa. Aug. 20, 1985), the Court found the franchisees' knowledge that their gallonage had declined by 50% over 11 years was in and of itself sufficient to put them on notice that nonrenewal was possible without any comment to that effect. As the Court stated:
Plaintiffs were not aware of [Amoco's] internal Profitability Index analysis, but they were aware of the underlying facts which resulted in the low Profitability Index figure. Thus, plaintiffs had enough information to determine that this agreement was likely to be uneconomical for [Amoco] and, therefore, that its decision not to renew did not violate the Act.
Slip op. No. 84-2883 at 5. Here it is undisputed that over the past three years Kessler's sales declined by 20%. He does not *860 dispute his awareness of the underlying facts giving rise to Amoco's determination to not renew his franchise. Hence, there is no dispute of fact that, assuming notice is required, Kessler had information constituting such notice as a matter of law.

IV. The Bona Fideness of Amoco's Offer to Sell Kessler the Land and Improvements for $951,157
For a valid nonrenewal to occur based by reason of uneconomical operation, the franchisor must make "a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interest in the premises." 15 U.S.C. § 2802(b)(3)(D)(iii)(I). The phrase "bona fide" means: (1) the franchisor determined the value of the property in the normal course of its business; and (2) the price offered reflected the franchisor's subjective belief as to the value of the property. See Tobias v. Shell Oil Co., 782 F.2d 1172 (4th Cir.1986); Kim v. Mobil Oil Corp., slip op. No. CV85-4689 PAR (C.D.Calif. July 16, 1986) [Available on WESTLAW, DCT database]; Slatky v. Amoco Oil Co., 626 F.Supp. 1223 (M.D.Pa. 1986). Cf. Robertson v. Mobil Oil Corp., 778 F.2d 1005 (3rd Cir.1985) (defining "bona fide" in a similar manner under a different provision of PMPA).
Therefore, the test is whether the franchisor offered the property at a price it thought the property was worth following the foregoing "bona fide" criteria, which is a subjective standard. See Kim, slip op. No. CV85-4689 PAR at 30-31; Slatky, 626 F.Supp. at 1227.
Kessler argues that there are two factual issues as to the bona fideness of Amoco's offer. First, he disputes the value assigned the land and improvements. In support of his contention he submits his own affidavit and that of an appraiser who respectively offer opinions that the equipment and land is over-valued. In essence, Kessler's position is that others would value the property differently. That allegation, even when taken as true, fails to raise a triable issue of fact. As the Court in Kim explained:
To allow a franchisee to raise a triable issue of fact merely by showing that the offering price differed from the fair market value as determined by his or other appraisers when the franchisor adequately explains the discrepancy, would make a court the arbiter between different appraisal figures and methods, require an open ended inquiry by the court into the business practices of franchisors in assessing the value of property they wish to sell; and in general, upset the delicate balance sought by Congress between the protection of franchisees from arbitrary and discriminatory terminations and nonrenewals and the interests of franchisors in initiating changes in their marketing activities.
Slip op. No. CU85-4689 PAR at 30-31.
Likewise, in Slatky, the exact Amoco procedures used here were reviewed and it was held that the Amoco offer to sell the leased premises for $256,300 was bona fide, notwithstanding the dealer's two appraisals for $158,200 and $145,000. Slatky holds that "the offer must approach what the offeror believes is the fair market value. It does not follow, however, that defendant's offer must approach the fair market value as determined by plaintiff's appraisers." 626 F.Supp. at 1227.
Kessler's other argument is that the Gilco offer, relied upon by Amoco, showed a value to the land and improvements of $750,000 and, therefore, that Amoco's offer of $951,157 does not reflect its subjective belief as to the value of the premises. In making this argument, Kessler relies upon the language of the contract that gives Gilco the right to acquire only the land, or at Gilco's option, both the land and improvements for $750,000. Kessler asserts that Amoco's subjective value of the property, both land and improvements, was $750,000, becaue he assumes that Amoco would have accepted the Gilco offer and that Gilco would have opted to take the improvements. However, these assumptions were not shown to be true. Amoco did not accept the Gilco offer. It interpreted that offer to mean that a third party was willing to pay $750,000 for only the land. As reflected in Amoco's documents regarding the offer, it adjusted its calculation *861 of the property to account for that possibility. Kessler does not dispute this sequence of events but argues that the Gilco offer can also be read as endorsing a value of $750,000 for both the station land and improvements. But this means only that there is a difference of opinion as to the weight to be given to the Gilco offer in Amoco's valuation process. As noted, differences in opinion as to the value of property, standing alone, are insufficient to raise a triable issue of fact, because they do not serve to controvert Amoco's affidavits demonstrating its subjective interpretation of the Gilco offer.[3]

V. Kessler's Right to Discovery
In addition to opposing the merits of Amoco's motion for summary judgment, Kessler also argues that he should be allowed discovery prior to entry of summary judgment. Kessler's argument in this regard is without merit.
As a general rule a plaintiff has no right to discovery prior to the entry of summary judgment. United States through Small Bus. Admin. v. Light, 766 F.2d 394, 397 (8th Cir.1985). This is so even when, as in this instance, the nonmoving party claims no opportunity for discovery existed prior to the filing of the motion for summary judgment. See Brown v. Chaffee, 612 F.2d 497, 504 (10th Cir.1979).[4]
Because there is no genuine issue as to any material fact concerning Amoco's conduct which satisfies the requirements of PMPA for nonrenewing Kessler's franchise, Amoco's motion for summary judgment is granted.
Kessler's motion for temporary restraining order and preliminary injunction is denied as moot. The clerk is directed to enter judgment for Amoco and against Kessler in accordance with this opinion with costs, if any, to defendant.
NOTES
[1] Originally, Kessler's wife was also named as a party plaintiff. The parties voluntarily dismissed her from the suit because only Thomas Kessler was a party to the service station lease that gave rise to the PMPA issues dealt with herein.
[2] It is undisputed that Amoco is a "franchisor", that Kessler is a "franchisee," and that the lease created a "franchise relationship" between them within the meaning of PMPA.
[3] It is somewhat noteworthy that Gilco ultimately raised its offer to $1,050,000.
[4] There is also an absence of Rule 56(f) compliance. Fed.R.Civ.P. 56(f).