**LCA CORPORATION,**
Appellant/cross-appellee,

v.

**SHELL OIL COMPANY,**
Appellee/cross-appellant.

Nos. 89–2637, 89–2820.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1990.

Decided Oct. 9, 1990.

Stephen G. Mirakian, Kansas City, Mo., for appellant/cross-appellee.

David M. Harris, St. Louis, Mo., for appellee/cross-appellant.

Before McMILLIAN and BOWMAN, Circuit Judges, and RE,[*] Chief Judge.

McMILLIAN, Circuit Judge.

LCA Corporation (LCA) appeals from a final judgment entered in the District Court[1] for the Eastern District of Missouri in favor of Shell Oil Company (Shell). LCA operates a full-service motor fuel and repair station in Webster Groves, Missouri. LCA commenced this action under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 *et seq.* (1988), seeking a declaration that Shell, the owner of the station, failed to make LCA a bona fide offer to sell the station premises after Shell decided not to renew the franchise lease, in violation of the PMPA, 15 U.S.C. § 2802(b)(3)(D)(iii)(I). LCA also sought an injunction ordering Shell to either renew the franchise lease or offer the premises to LCA for $247,930, or, in the alternative, damages resulting from its loss of business as a fuel and repair service station. After a bench trial, the district court entered judgment in favor of Shell and enjoined LCA from further occupying the premises. *LCA Corp. v. Shell Oil Co.*, No. 89–1027–C(5) (E.D.Mo. Oct. 11, 1989).

For reversal, LCA argues the district court erred in (1) finding Shell's offer was bona fide, (2) refusing to permit one of LCA's expert witnesses to testify, and (3) refusing to admit any testimony regarding the reasonableness of the non-price terms of Shell's offer. On cross-appeal, Shell urges us to adopt a purely subjective standard of what constitutes a bona fide offer. For the reasons discussed below, we affirm the judgment of the district court.

I.

In March 1986, Shell leased the premises at 135 West Lockwood to W.A. Hollabaugh. The lease term commenced on April 1, 1986, and was scheduled to expire on March 31, 1989. Effective November 3, 1987, W.A. Hollabaugh assigned the lease to LCA. LCA assumed the lease with the understanding that Shell intended to sell the premises and not renew the franchise lease upon its expiration on March 31, 1989. Around December 20, 1988, Shell officially notified LCA of its intent not to renew the franchise lease and dealer agreement because Shell had decided to sell the premises. LCA received that notice sometime before December 31, 1988.

---

[*] The Honorable Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation.

[1] The Honorable Carol E. Jackson, United States Magistrate for the Eastern District of Missouri. The case was tried by the magistrate with the consent of the parties. 28 U.S.C. § 636(c) (1988).

Shell made its initial offer to sell the station premises to LCA on or before February 28, 1989, at a price of $247,930, and agreed to leave the offer open until March 30, 1989. Shell arrived at its initial asking price of $247,930 after obtaining an independent real estate appraisal of the land, an independently-conducted environmental assessment of the site, and an evaluation by one of Shell's engineers of the station's improvements and equipment. The real estate appraiser, Edgar C. Hartnett, submitted to Shell a "land only" appraisal based on a method which compares the "land only" sale price of commercial sites similar in size and location to the Shell site. Hartnett concluded that the fair market value of the "land only" was $190,000. Shell's engineer meanwhile appraised the value of the improvements and equipment at $79,030. Pursuant to Shell's nation-wide policy, instituted to avoid exposure to liability for leaking underground fuel tanks,[2] Shell planned to remove the underground fuel tanks and fuel lines then installed at the station and did not offer to sell them to LCA. Shell therefore deducted from the total appraisal value of $269,030 the value of the existing tanks and lines, approximately $21,000, to arrive at an offering price of $247,930. Shell did, however, give LCA the option of purchasing new tanks and lines from a supplier arranged by Shell.[3]

Prior to receiving Shell's initial offer, LCA's owner, Lawrence Mulholland, anticipated that Shell would not offer to sell the existing underground tanks and fuel lines. He therefore began, as early as February 10, 1989, to make other arrangements to purchase new tanks and lines, and never indicated to Shell he was interested in taking advantage of Shell's tank offer.

After receiving Shell's initial offer, Mulholland contacted a bank about obtaining a loan to purchase the station premises. At the bank's request, Mulholland had the premises appraised. The appraiser, William Krodinger, used several methods. At trial Krodinger testified that, according to a method that assumed the site would continue as a gasoline service station, the site was worth $255,000. Krodinger's other appraisals indicated a value ranging from $200,000 to $205,000.

On March 23, 1989, LCA offered to buy the station premises for $177,000. Shell rejected this offer but agreed to extend its initial offer until April 21, 1989. Shell also agreed to extend the franchise lease until September 27, 1989. LCA submitted a second offer for $217,000, but this offer was also rejected by Shell.

After its offer to LCA expired, Shell began exploring the possibility of selling the station premises with a fifteen-year restriction prohibiting its use as a gasoline station. Recognizing that this restriction would depreciate the value of the property, Shell considered offers from third-parties other than LCA for as low as $210,000. On

**2.** New underground fuel tanks are more desirable from an environmental standpoint. Three of the four tanks on the station premises are twenty-six years old and are made from unprotected steel. Federal law no longer allows the installation of unprotected steel tanks because they are prone to leakage. 42 U.S.C. § 6991b(g) (Supp. V 1987). In addition, federal environmental regulations require that all steel tanks installed prior to 1965 be equipped with leak detection devices and be tested monthly. 40 C.F.R. § 280.40–.45 (1989).

**3.** The exact language of Shell's offer was as follows:

Shell has made the determination in good faith and in the normal course of business, based on its assessment of environmental risks, to remove the underground tanks and associated product lines for the storage of motor fuels, waste oil and/or fuel oil. The removal of the tanks and associated product lines shall be accomplished on or before the closing hereunder. Shell will, at Purchaser's request, for which Purchaser hereby agrees to indemnify and hold Shell harmless from all claims, suits and loss as a result thereof (which indemnity shall survive the closing), appropriately barricade and not backfill the excavations resulting from the removal of any such tank or tanks and product lines. Purchaser may elect, at Purchaser's sole discretion and expense and by giving notice to Shell prior to closing, to purchase new underground tanks and lines from a supplier arranged by Shell at Shell's price if available. In such event, Purchaser will be solely responsible for completing any such tank purchase and installation, and Shell will have no responsibility therefor.

April 27, 1989, and again on May 15, 1989, after the expiration of Shell's offer, LCA offered to buy the premises for $240,000. Shell rejected LCA's offers. On May 25, 1989, Shell also rejected an offer by LCA to buy the station premises for Shell's initial asking price of $247,930.

Based on these events, LCA commenced this action under the PMPA, 15 U.S.C. § 2802(b)(3)(D). According to that section, a franchisor's decision to sell the premises is a permissible ground for nonrenewal of the franchise lease if the decision is made by the franchisor in good faith and in the normal course of business. 15 U.S.C. § 2802(b)(3)(D)(i). In such circumstances, the franchisor must make a bona fide offer to sell the premises to the franchisee within ninety days of notifying the franchisee of its decision not to renew the lease. *Id.* § 2802(b)(3)(D)(iii)(I). At the conclusion of trial, the district court found that Shell had satisfied both requirements. The district court concluded that Shell's reason for nonrenewal of the franchise, its decision to sell the premises, was its true reason, made in the ordinary course of business, and made in good faith. *LCA Corp. v. Shell Oil Co.,* No. 89–1027–C(5), slip op. at 12–15. The district court also found that Shell's offer to sell the premises to LCA was bona fide under the standard enunciated in *Slatky v. Amoco Oil Co.,* 830 F.2d 476, 485 (3d Cir. 1987) (*Slatky*). Slip op. at 23. The district court accordingly entered judgment in favor of Shell and ordered LCA to vacate the premises. This appeal and cross-appeal followed.

## II.

### A.

■ According to the PMPA, a franchisor who decides not to renew the franchise lease must make "a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interest in such premises." 15 U.S.C. § 2802(b)(3)(D)(iii)(I). Courts are divided on whether the term "bona fide" requires an objective or a subjective look at the offer. In *Kessler v. Amoco Oil Co.,* 670 F.Supp. 853, 860 (E.D. Mo.1987), the district court applied a purely subjective standard: "The phrase 'bona fide' means: (1) the franchisor determined the value of the property in the normal course of its business; and (2) the price offered reflected the franchisor's subjective belief as to the value of the property." However, most courts, including our own, have required some objective reasonableness in order for the offer to be bona fide. In *Roberts v. Amoco Oil Co.,* 740 F.2d 602, 607 (8th Cir.1984) (*Roberts*), we distinguished the "good faith" requirement in 15 U.S.C. § 2802(b)(3)(D)(i) that attaches to a franchisor's decision to terminate the franchise relationship from the requirement in § 2802(b)(3)(D)(iii)(I) that the offer be bona fide: "The separate inquiry of whether [the franchisor's] offer of sale to [the franchisee] was 'bona fide' may certainly involve notions of subjective good faith, but a 'bona fide offer to sell' the service station premises has been objectively defined in the PMPA." The Third Circuit reached a similar conclusion in *Slatky:* "Courts should determine first if the [franchisor] believed its offer price represented fair market value. Even if the [franchisor] did have that sincere belief, however, courts should also determine whether the estimate was objectively reasonable, *i.e.,* whether the offer approached fair market value." 830 F.2d at 485 (footnote omitted). In the present case, the district court applied the test enunciated by the *Slatky* court, which combines both subjective and objective good faith, and found in favor of Shell. Despite the favorable outcome, Shell on cross-appeal urges us to reject the objective test in favor of a purely subjective one. We decline to do so because our holding in *Roberts* indicates that a bona fide offer requires some degree of objective reasonableness. 740 F.2d at 607.

### B.

■ We review the district court's finding that Shell's offer was bona fide under the clearly erroneous standard. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). We will reverse the district court's finding of fact only if a

review of the entire record leaves us with a "definite and firm conviction" that a mistake has been made. *Id.* at 573, 105 S.Ct. at 1511. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573–74, 105 S.Ct. at 1511. LCA argues that the offer was not bona fide as a matter of law because (1) Shell excluded from the offer underground fuel tanks and fuel lines necessary to the continued operation of a full service gasoline station and (2) the asking price did not reasonably approximate fair market value. We address each argument in turn.

1.

■ The district court did not clearly err in finding that Shell's offer was bona fide despite Shell's failure to include in the offer the existing underground fuel tanks and fuel lines. In *Roberts*, we held that the franchisor's failure to include in its offer the underground fuel tanks and fuel lines rendered the offer not bona fide as a matter of law because "[the PMPA] requires that franchisees have an opportunity to continue in business by purchasing the entire premises used in selling motor fuel." 740 F.2d at 607. We do not read *Roberts* to hold that the franchisor's failure to include in the offer existing underground fuel tanks and fuel lines is *per se* a violation of the PMPA's requirement that the offer be bona fide. Whether a particular offer to sell is bona fide must be decided on a case by case basis considering the offer as a whole and the purposes underlying the PMPA.

The district court distinguished the present case from *Roberts* on two grounds. First, the district court held that the offer was not rendered not bona fide by Shell's failure to offer LCA the existing fuel tanks and lines because LCA, unlike the franchisee in *Roberts*, did not want the existing tanks and lines and began arranging for the purchase of new tanks and lines from another supplier before receiving Shell's initial offer. *LCA Corp. v. Shell Oil Co.*, No. 89–1027–C(5), slip op. at 21. Second, the district court held that because Shell offered to arrange for and purchase at Shell's expense new underground fuel tanks and fuel lines in lieu of offering LCA the existing tanks and lines, "LCA would not have been left without the equipment necessary to continue its business." *Id.* Either ground sufficiently distinguishes the present case from *Roberts* and supports the district court's finding that Shell's offer to LCA was bona fide.

LCA argues that it made arrangements to purchase new tanks and lines from another supplier only because it knew that Shell's offer would not include the existing tanks and lines. While this may have been a permissible inference from Mulholland's testimony, the district court could have inferred that LCA did not want Shell's tanks. When asked whether he ever told Shell he wanted the existing tanks, Mulholland stated, "Nope, I really don't want them." In addition, Mulholland testified that he began negotiations to purchase new tanks and gasoline lines from Phillips 66. Mulholland planned to operate the station as a Phillips 66 station with new pump islands, canopies, pumps, and a new layout. He testified that he was working on an arrangement whereby Phillips 66 would assess a surcharge per gallon of gasoline sold in exchange for new tanks and lines. From this testimony, it was permissible for the district court to infer that LCA was not interested in obtaining from Shell either the tanks that were already on the premises or new tanks from a Shell supplier.

LCA also argues that *Roberts* cannot be distinguished on the ground that Shell offered to arrange for the purchase of new tanks and fuel lines because Shell's offer did not specify whether replacement tanks were even available, the price at which Shell would sell the tanks if available, and whether Shell would arrange or pay for their installation. LCA argues that these factors distinguish the present case from *Tobias v. Shell Oil Co.*, 782 F.2d 1172, 1174 (4th Cir.1986) (*Tobias*), in which the court held that the franchisor satisfied its obli-

gations under the PMPA by offering the franchisee new fiberglass tanks in lieu of existing tanks. We disagree. At trial, Shell witnesses testified that the lack of specificity in Shell's offer to arrange for new underground fuel tanks and lines was due to LCA's failure to notify Shell that it intended to take advantage of Shell's tank offer. Shell indicated that upon LCA's notification, it would have determined what tanks LCA wanted and what arrangements were necessary for their procurement. From this evidence the district court could have inferred that had LCA notified Shell of its wish to purchase tanks through Shell, LCA would have received a specific tank offer. In this regard, the facts in the present case, as found by the district court, are closer to the facts in *Tobias* than they are to the facts in *Roberts,* and therefore we uphold the district court's finding that Shell's offer was bona fide despite Shell's failure to include in its offer the existing underground fuel tanks and fuel lines.[4]

2.

■ We also hold that Shell's initial offer of $247,930 was not so far from the fair market value of the premises as to render the offer not bona fide as a matter of law. As LCA seems to accept, the objective reasonableness test does not measure whether the franchisor's offer was actually at fair market value but rather whether the offer approached fair market value. *See Slatky,* 830 F.2d at 485. LCA argues that the district court could not have inferred from Shell's calculations that the offer approximated fair market value because Shell's appraiser, Edgar Hartnett, appraised the land at its "highest and best use" and testified that it was doubtful that a gasoline station was the land's "highest and best use." Therefore, LCA argues that Shell should not have added to Hartnett's appraisal the value of improvements and equipment that would not necessarily be adaptable to the use for which the land was valued. We disagree. The district court could have concluded from Hartnett's testimony that the value he assigned to the land was consistent with its use as a gasoline station. Hartnett testified that he appraised the land for a variety of commercial uses and did not reach a single conclusion as to the land's highest and best use. Moreover, Hartnett testified that the value he assigned to the land would be the same if he had appraised the land specifically for use as a gasoline station.

In concluding that $247,930 reasonably approximated fair market value, the district court also relied on the value assigned to the premises by LCA's own appraiser, William Krodinger, under an alternative value approach. Under this approach, Krodinger determined the annual net revenue from LCA's operations and deducted from that amount an annual return factor based on the investment made to purchase the location and to purchase and install new gasoline station equipment and a canopy. Under this approach, Krodinger valued the premises at $255,000. LCA argues that the district court's reliance on Krodinger's alternative value appraisal was erroneous because this approach values a "new and improved" service station, not the station that was offered to LCA. However, the evidence suggests that Krodinger deducted the expense of improvements needed to operate a "new and improved" service station from his calculations before arriving at the $255,000 figure. Therefore, it was permissible for the district court to rely on Krodinger's appraisal.

Finally, there was evidence to suggest that comparable property sold for $12.39 per square foot and that the premises at 135 West Lockwood occupied 20,750 square feet. According to this calculation, the site was worth $257,092.

---

4. In *Tobias v. Shell Oil Co.,* 782 F.2d 1172, 1173 (4th Cir.1986), the details of the franchisor's offer to sell the franchisee new fiberglass underground fuel tanks in lieu of the existing tanks were arranged during preliminary negotiations between the franchisee and the franchisor. The franchisor offered to install new fiberglass tanks at the franchisor's equipment cost of $50,000 and suggested the franchisee could finance this expense through a contract for gasoline. *Id.* The franchisee declined the franchisor's offer, preferring to purchase fuel and equipment from an alternate supplier. *Id.*

From any of these calculations, the district court could have inferred that Shell's initial offer of $247,930 reasonably approximated the fair market value of the premises and therefore was a bona fide offer for purposes of 15 U.S.C. § 2802(b)(3)(D)(iii)(I).

### III.

LCA also argues that the district court erred in refusing to allow Robert West to testify as an expert witness or to allow *any* testimony, lay or expert, regarding the reasonableness of the non-price terms of Shell's offer. Shell argues that the district court did not abuse its discretion by refusing to designate West as an expert because LCA's designation was untimely. Shell also argues that the district court did not err in refusing to admit testimony about the non-price terms because LCA did not notify Shell in a timely manner that LCA was challenging the reasonableness of the non-price terms of Shell's offer. Shell argues that because LCA failed to give notice in any of its pleadings or pretrial discovery that it intended to challenge the reasonableness of non-price terms of the offer, the district court properly excluded any evidence, including the expert testimony of West, on that subject.

■ The district court had two grounds for striking the designation of West as an expert witness. First, the district court could have, within its discretion, found that the designation was untimely. *See Minnkota Power Cooperative, Inc. v. Manitowoc Co.,* 669 F.2d 525, 528–29 (8th Cir.1982) (expert testimony excluded because the designation was made three months after the close of discovery). LCA designated West as an expert witness on August 23, 1989, seven days before trial, even though LCA had deposed West earlier and had identified him as a fact witness on July 14, 1989. *See id.* at 529 (party possessed the information required to designate an expert witness long before the close of discovery).

■ Second, the district court could have stricken the designation on the ground that West's testimony addressed a new issue of which Shell had not been timely notified.

*See Havenfield Corp. v. H & R Block, Inc.,* 509 F.2d 1263, 1272 (8th Cir.) (no abuse of discretion in disallowing untimely raising of new issues), *cert. denied,* 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975); *Nutt v. Black Hills Stage Lines, Inc.,* 452 F.2d 480, 483 (8th Cir.1971) (newly discovered evidence should be discovered far enough in advance of trial to allow the opposing party sufficient time to prepare a defense). West would have testified about the reasonableness of the non-price terms of Shell's offer. However, nowhere in its pleadings or discovery did LCA indicate with sufficient specificity that it intended to challenge the reasonableness of the non-price terms of Shell's offer other than Shell's exclusion of the existing underground fuel tanks and lines. LCA points to its answer to Shell's Interrogatory No. 4 in which Shell asked LCA to identify all facts upon which it based its allegations that Shell's offer was not bona fide. The only reference to terms other than the price and the exclusion from the offer of the existing underground fuel tanks and fuel lines is found in response (h) which states, "Shell has rejected all of LCA's offers and has refused to negotiate on the price, terms, or conditions of sale." Appellant's Appendix at 69. The district court did not abuse its discretion in finding that this response was insufficient to alert Shell that LCA intended to challenge the reasonableness of the non-price terms of Shell's offer. Because West's expert testimony concerned only the non-price terms of Shell's offer and because his designation as an expert was untimely, the district court did not abuse its discretion in granting Shell's motion to strike the designation.

■ In addition, the district court did not abuse its discretion in refusing to admit any testimony, lay or expert, about the reasonableness of the non-price terms of Shell's offer. LCA first raised the issue of the non-price terms of Shell's offer during cross-examination of John Krebs, Shell's area real estate representative. Shell objected. The district court expressed its concern about admitting any evidence on this issue because the issue had not been

raised in the pleadings or in any of the pretrial materials. Tr. Vol. I, at 55. The district court then gave LCA an opportunity to specify where it had raised the issue. LCA was unable to do so (although, as noted above, during West's testimony, LCA unsuccessfully cited response (h) as raising the issue), and the district court sustained Shell's objection. *Id.* at 63–64. Under these circumstances, the district court did not err in refusing to admit any testimony regarding the reasonableness of the non-price terms of Shell's offer.

Accordingly, the judgment of the district court is affirmed. The appeal and cross-appeal are denied.