Charles W. HARRIS dba Harris
Big Hill Shell, Plaintiff,

v.

EQUILON ENTERPRISES,
LLC, Defendant.

No. C–3–99–242.

United States District Court,
S.D. Ohio,
Western Division.

March 13, 2000.

Dwight A. Washington, Dayton, OH, for Plaintiff.

Randall S. Rabe, Elizabeth Scully, Baker & Hostetler, Columbus, OH, for Defendant.

## DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DOC. # 2); PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT (DOC. # 19) OVERRULED; DEFENDANT'S MOTION IN LIMINE (DOC. # 6) SUSTAINED; CONFERENCE CALL SET

RICE, Chief Judge.

This litigation stems from the Defendant's non-renewal of a contract under which the Plaintiff operates a Shell gas station as a franchisee. After refusing to renew the agreement, the Defendant offered to sell the gas station to the Plaintiff, who rejected the offer and asserted that the proposed purchase price was unreasonable. The Plaintiff then filed suit against the Defendant, alleging a violation of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, *et seq.* (Doc. # 1). In his Complaint, the Plaintiff contends that the Defendant violated the Act by failing to make a "bona fide offer" to sell him the gas station. (*Id.*). The Plaintiff's Complaint requests compensatory and punitive damages, as well as injunctive relief. Pending before the Court are three Motions: (1) Plaintiff's Motion for a Preliminary Injunction (Doc. # 2)[1]; (2) Plaintiff's Motion for Leave to File an Amended Complaint (Doc. # 19); and (3) Defendant's Motion in Limine (Doc. # 6). After setting forth a brief overview of the facts underlying this litigation, the Court will address the foregoing Motions.

### I. *Factual Background* [2]

The Plaintiff is the operator of a Shell franchise located at 3985 South Dixie Highway in Kettering, Ohio. (Tr. I at 20–21). His business includes selling fuel and operating a service station with three bays for automobile repairs. (*Id.* at 25). The Plaintiff obtained the Shell franchise by assignment from John Reed. (*Id.* at 22). Under the terms of the assignment, the Plaintiff assumed the unexpired term of Reed's auto care contracts, his motor fuel contracts, and his lease agreement. (*Id.* at 22–23). Those documents, which are re-

---

1. The Plaintiff's Motion is actually a Motion for a Temporary Restraining Order. (Doc. # 2). In a June 4, 1999, Entry, however, the Court declared the request for a TRO to be moot, based upon the Defendant's agreement to preserve the status quo, pending a determination of the Plaintiff's entitlement to injunctive relief. (Doc. # 3). The Court then construed the Plaintiff's Motion for a TRO as one also seeking a preliminary injunction. (*Id.* at 1–2).

2. The following findings of fact are based upon the testimony and exhibits presented at the July 14, 1999, and August 11, 1999, oral and evidentiary hearing on the Plaintiff's Motion for a Preliminary Injunction. In its analysis, *infra*, the Court will set forth additional pertinent facts based, once again, upon the testimony and exhibits presented at the oral and evidentiary hearing. Hereinafter, the designation "Tr. I" will refer to the transcript of the testimony taken on July 14, 1999, and "Tr. II" will refer to testimony taken on August 11, 1999.

ferred to collectively by the parties as the "dealer documents," provided that neither Shell nor the Plaintiff had any obligation to renew the franchise agreement upon its May 31, 1999, expiration.

Defendant Equilon is a recently formed corporation owned by Shell, Texaco, and Star Enterprises.[3] (Tr. I at 127, 135). In 1998, Equilon examined the viability of its Shell service stations nationwide and decided to relinquish a number of them. (*Id.* at 129). The company made this decision based upon the low volume of fuel sales at some of its sites. (*Id.* at 129–130). Equilon decided to relinquish the Plaintiff's station because its fuel sales did not meet the company's minimum buying requirements and its revenues were down twenty percent from 1997 to 1998. (*Id.* at 130–131).[4]

After deciding not to renew the Plaintiff's franchise agreement, Equilon sent him a notice in February, 1999, informing him of its decision. (*Id.* at 132). The company then offered to sell the Plaintiff his service station franchise for $294,712. (Tr. II at 35–36). The offer included the real estate, the service station building, site improvements, and all equipment. (*Id.*). The company arrived at its asking price by hiring an independent real estate appraiser to appraise the land, and by having one of its engineers place a depreciated value on the equipment, building, and site improvements. (*Id.*). Notably, however, Equilon's offer to the Plaintiff did not include the three existing underground fuel tanks. (*Id.* at 35). The tanks were twenty-nine years old at the time of its offer, and they carried only a thirty-year warranty. (*Id.* at 77–78). Believing that the tanks were nearing the end of their useful life, and fearing potential environmental liability, the company refused to include them in its offer to the Plaintiff. Instead, Equilon informed the Plaintiff in writing that it would assist him in obtaining new tanks through one of its suppliers. (Def.Exh. F).

The Plaintiff refused the company's offer after hiring his own real estate appraiser to determine the value of the subject property. The Plaintiff's appraiser, Greg Corbolotti, initially determined that the real estate, service station building, and site improvements had a fair market value of $250,000, if the underground fuel tanks were included. (Tr. I at 62). Without the tanks, he concluded that the fair market value would be reduced by $60,000 to $190,000. (*Id.* at 97). At the oral and evidentiary hearing, Corbolotti revised his estimate, based upon an error in his appraisal report, and he determined that the site had a fair market value of $264,000 with the underground tanks. (*Id.* at 62–63, 74, 76). Corbolotti's appraisal did not place any value on the various pieces of equipment which were included in Equilon's offer to the Plaintiff. (*Id.* at 76, 91–93). That equipment included, *inter alia*, fuel island canopies valued by Equilon at $43,992, modern gasoline dispensers valued by the company at $21,120, a nearly new fiberglass waste oil tank valued by the company at more than $10,000, and signs valued by the company at $11,100. (Def. Exh. J; Tr. II at 74).

After failing to negotiate an acceptable purchase price, the Plaintiff commenced the present litigation, asserting a claim against Equilon under the PMPA. He contends that the company has violated the Act by (1) not making a "good faith" decision to sell the subject property, and (2)

**3.** In his testimony at the oral and evidentiary hearing, Equilon representative Thomas Gravlin identified the company as a partnership. (Tr. I at 127). In his deposition, however, Gravlin identified the company as "Equilon Enterprises, LLC." (Gravlin depo. at 10). The Court notes also notes that Equilon has been identified as "Equilon Enterprises, LLC" in the caption of this litigation. For purposes of the Court's analysis herein, Equilon's status as either a corporation or a partnership is irrelevant.

**4.** In terms of sales and revenue, the Plaintiff's station ranked 43rd out of 45 Shell stations in the Dayton area. (*Id.* at 131).

not making him a "bona fide offer" to purchase the franchise.

## II. *Plaintiff's Motion for a Preliminary Injunction (Doc. # 2)*

■ Congress enacted the PMPA in 1978 to protect franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises. *See Massey v. Exxon Corp.*, 942 F.2d 340, 342 (6th Cir. 1991).[5] The Act lowers the traditional burden on a plaintiff who seeks a preliminary injunction.[6] *Corbin v. Texaco, Inc.*, 690 F.2d 104, 105 (6th Cir.1982). "A franchisee is entitled to a preliminary injunction under the Act based upon a lesser showing than would be required in the ordinary case under Fed.R.Civ.P. 65." *Beachler v. Amoco Oil Co.*, 112 F.3d 902, 905 (7th Cir.1997). Under the PMPA, a franchisee may obtain injunctive relief upon a showing that: (1) the franchise has been terminated or not renewed; (2) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and (3) on balance, the hardship imposed upon the franchisor by issuance of an injunction will be less than the hardship imposed upon the franchisee if injunctive relief is denied. *Id.*, citing 15 U.S.C. § 2805(b)(2). With these standards in mind, the Court turns now to its analysis of the Plaintiff's pending Motion for a Preliminary Injunction.[7]

5. In *Massey*, the Sixth Circuit set forth the policy underlying Congress' enactment of the PMPA:

Congress enacted the PMPA in 1978 to create a uniform set of rules covering the grounds for termination and non-renewal of motor fuel marketing franchises, and "to protect 'franchisees from arbitrary or discriminatory termination or non-renewal of their franchises.'" *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1216 (7th Cir.1982) (citing S.Rep. No. 731, 95th Cong.2d Sess. 15, *343 reprinted in 1978 U.S.Code Cong. & Admin.News 873, 874).

The franchise relationship in the petroleum industry is unique in that the franchisor commonly not only grants a trademark license and supplies the products but also leases the service station premises to the franchisee. As Congress noted, "[t]his relationship is, therefore, often complex and characterized by at times competing interests." *Id.* at 17, U.S.Code Cong. & Ad.News at 875. Congress designed the PMPA to allay three specific concerns: that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; that gross disparity of bargaining power may result in franchise agreements that amount to contracts of adhesion; and that termination or nonrenewal may disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one.

*Massey*, 942 F.2d at 342.

6. Under the traditional test, a District Court may exercise its equity power and issue a preliminary injunction after balancing the following factors:

(1) the likelihood that the party seeking relief will succeed on the merits of the claim; (2) whether the party seeking relief will suffer irreparable harm without the preliminary injunction; (3) the probability that granting the requested relief will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the preliminary injunction.

*Cf. Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994).

7. Although the parties have not raised the issue, the Court notes the existence of a threshold question regarding its power to grant preliminary injunctive relief in this matter. In *Patel v. Sun Co., Inc.*, 63 F.3d 248, 252–253 (3rd Cir.1995), the court read 15 U.S.C. § 2805(e) as prohibiting the issuance of a preliminary injunction when a franchisor fails to renew a franchise agreement and seeks to sell the subject property. *Id.* at 252 n. 7. Section 2805(e) provides that a court "may not compel a continuation or renewal of the franchise relationship" if a franchisor demonstrates that its basis for non-renewal is a good faith decision, made in the ordinary course of business, to sell the subject premises.

In the present case, Equilon's proffered reason for not renewing its franchise relationship with the Plaintiff is its desire to sell the property. Based upon reasoning to be set forth, *infra*, the Court finds that Equilon made this decision in good faith and in the ordinary course of business. As a result, under the Third Circuit's interpretation of § 2805(e), the Court lacks the power to enter a preliminary injunction requiring Equilon to continue its franchise relationship with the Plaintiff, pending resolution of this litigation.

### A. Non-renewal of the Franchise Agreement

It is undisputed that Equilon has refused to renew its franchise agreement with the Plaintiff. (Defendant's Post–Hearing Brief, Doc. # 34 at 2 n. 2). Consequently, the Plaintiff has met the first requirement for obtaining a preliminary injunction.

### B. Sufficiently Serious Questions Going to the Merits

In order to enter a preliminary injunction, the Court also must find "sufficiently serious questions going to the merits to make such questions a fair ground for litigation." This requirement has been construed to mean that a plaintiff must show "a reasonable chance of success on the merits" of his PMPA claim. *Beachler,* 112 F.3d at 905; *Doebereiner v. Sohio Oil Co.,* 880 F.2d 329, 333 (11th Cir.1989); *Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1216 (7th Cir.1984). The Sixth Circuit has interpreted the phrase "serious questions going to the merits" to mean questions "so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.,* 119 F.3d 393, 402 (6th Cir.1997). Before addressing the Plaintiff's ability to satisfy this standard, the Court will briefly review the substantive law underlying his claim.

"The PMPA enumerates the exclusive means by which a franchisor engaged in the sale, consignment or distribution of motor fuel may terminate or nonrenew a franchise." *Clark v. BP Oil Co.,* 137 F.3d 386, 390 (6th Cir.1998). Under the Act, a franchisor such as Equilon ordinarily may not terminate or refuse to renew a franchise relationship. 15 U.S.C. § 2802(a). Notably, however, the PMPA carves out several exceptions to this general rule. *Geib v. Amoco Oil Co.,* 29 F.3d 1050, 1059 (6th Cir.1994), citing 15 U.S.C. § 2802(b)(1), (2), and (3). One of those exceptions permits a franchisor to non-renew a franchise relationship if it plans to sell the leased premises. 15 U.S.C. § 2802(b)(3)(D). In order to invoke this exception, a franchisor must satisfy certain prerequisites. *First,* the decision to sell the property must be made by the franchisor in good faith and in the normal course of business. *Id. Second,* the franchisor must make either a bona fide offer to sell the premises to the franchisee or offer the franchisee a right of first refusal. *Id.*

In the present case, the parties' Memoranda address both of the foregoing issues.[8] Specifically, the Plaintiff alleges that Equilon's decision to sell the Shell station was not made in good faith and not in the normal course of business. The Plaintiff also alleges that Equilon did not make a "bona fide offer" to sell him the gas station. After reviewing the evidence presented at the hearing on this matter, however, the Court finds no sufficiently serious questions going to the merits of these issues to warrant the issuance of a preliminary injunction.

▪ In its Memorandum, Equilon insists that its decision not to renew the Plaintiff's franchise agreement was made

---

Upon review, however, the Court declines to follow the Third Circuit's interpretation of § 2805(e). Instead, the Court finds persuasive the Ninth Circuit's interpretation in *Hilo v. Exxon Corp.,* 997 F.2d 641, 644–647 (9th Cir.1993). After considering the language of the statute, the overall structure of § 2805, legislative history, and policy considerations, the *Hilo* court interpreted § 2805(e) as prohibiting permanent injunctive relief, but not preliminary injunctive relief. *Id.; see also Patel,* 63 F.3d at 259–260 (Sarokin, J., dissenting). Based upon the thorough and well-reasoned analysis set forth in *Hilo,* the Court concludes that § 2805(e) does not prohibit the entry of a preliminary injunction in the instant case.

**8.** The parties' filings include post-hearing briefs and reply briefs. (Doc. # 33–36). On December 13, 1999, the Plaintiff sought leave to file a supplemental reply (Doc. # 38). Although the Court granted him leave on December 15, 1999 (Doc. # 38, Notation Entry), the Plaintiff never filed a supplemental brief.

in the ordinary course of business and in good faith. Specifically, the company contends that it made a financial decision not to renew the Plaintiff's lease and to relinquish its ownership of his location, along with several others in the Dayton area. This assertion is supported by the testimony of Equilon representative Thomas Gravlin, who explained that the company made a business decision to non-renew the Plaintiff's lease in 1998, after conducting a nationwide evaluation of its retail outlets.[9] (Tr. I at 128–129). According to Gravlin, the Plaintiff's location was selected for relinquishment because (1) it did not meet Equilon's minimum monthly fuel sales, (2) additional investment in the station would not make it a "resilient" site, and (3) the Plaintiff's fuel sales were continuing to decrease. (*Id.* at 131). Gravlin also stated that the Plaintiff's Shell station ranked 43 out of 45 area stations with respect to sales and revenue. (*Id.*). In his testimony, the Plaintiff did not dispute Gravlin's assertions. He admitted his awareness that Equilon had been reviewing area stations for possible relinquishment. (*Id.* at 47–48). He also admitted knowing that Equilon had been concerned about the volume of his fuel sales. (*Id.* at 48). The Plaintiff further acknowledged that an Equilon representative had encouraged him to raise his fuel sales. (*Id.*). Finally, the Plaintiff admitted knowing that his location might be closed if his fuel sales did not increase. (*Id.* at 48–49).

In light of the foregoing testimony, the Court concludes that Equilon made a good faith decision in the normal course of business not to renew the Plaintiff's franchise agreement. With respect to the "good faith" requirement, the evidence suggests that the company's decision was motivated by purely financial concerns. Nothing in the record indicates that Equilon acted with a discriminatory motive, or that it made a "sham" non-renewal decision.[10] With respect to the "normal course of business" requirement, the evidence reflects that the company decided not to renew the Plaintiff's franchise agreement as part of its normal decision-making process. Indeed, Equilon made its decision in the context of a nationwide evaluation of its retail outlets.[11]

The only remaining issue, then, is whether the company made a "bona fide offer" to sell the Shell station to the Plaintiff. In the context of the present litigation, this issue raises two questions: (1) whether Equilon's offer to sell the Plaintiff the Shell station without the underground fuel storage tanks rendered the offer not bona fide; and (2) whether the company's proposed selling price was too high to constitute a "bona fide offer" to sell.

With respect to the removal of the underground tanks, the Plaintiff advances a number of arguments. *First,* he suggests that the PMPA required Equilon to include the underground fuel tanks in its offer to sell. (Doc. # 33 at 12). *Second,* he contends that Equilon presented no

---

**9.** Under the terms of the franchise agreement, Equilon had no obligation to renew the Plaintiff's lease upon its expiration. (Defendant's Exh. A at Articles 10 and 14). Furthermore, the Plaintiff knew that the franchise agreement expired on May 31, 1999. (Tr. I at 45–46).

**10.** "The good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal." *Bucklew v. Standard Oil Co.,* 831 F.2d 293, 1987 WL 38149 (6th Cir. Oct. 14, 1987); *Evans v. Marathon Oil Co.,* 173 F.3d 428, 1999 WL 137633 (6th Cir. March 2, 1999). "The test for good faith is one of subjective in-

tent.... So long as the franchisor does not have a discriminatory motive ..., the franchisor has met the burden required by the PMPA for determining good faith." *Id.* (citations omitted).

**11.** Cf. *Massey,* 942 F.2d at 345 ("The second test is whether the determination was made 'in the normal course of business.' Under this test, the determination must have been the result of the franchisor's normal decision-making process.... [I]t it is not necessary for the courts to determine whether a particular marketing strategy, such as a market withdrawal, ... is a wise business decision.").

evidence of environmental or safety issues associated with the underground tanks at the Shell station. (*Id.* at 12, 14). He also suggests that concern for avoiding tort liability or environmental damage is not relevant and cannot transform a deficient offer into a bona fide one. (*Id.* at 15). *Third*, he contends that Equilon neither offered to sell him the existing tanks nor made arrangements for new tanks to be installed. He also contends that he "was never provided with an opportunity of purchasing new tanks from Defendant or a supplier that Defendant made arrangements with." (*Id.* at 12, 15). *Fourth*, the Plaintiff notes that "the costs of the tanks were not offered to be deducted from the total asking price of the property." (*Id.*). *Fifth*, he attempts to distinguish *LCA Corp. v. Shell Oil Co.*, 916 F.2d 434 (8th Cir.1990), in which the court concluded that a franchisor's refusal to sell existing underground tanks did not violate the PMPA. (*Id.* at 13). *Sixth*, the Plaintiff contends that Equilon (or its parent corporation, Shell Oil Company) has included the underground tanks in other franchise sales, despite the alleged existence of a company policy that prohibits such tanks from being sold. (*Id.* at 13–15). After reviewing the testimony presented at the two-day oral and evidentiary hearing, as well as the language of the PMPA and applicable case law, the Court finds each of the Plaintiff's arguments to be unpersuasive. For purposes of clarity, the Court will address each argument separately.

 *First*, a franchisee has no absolute right to purchase existing underground fuel tanks or fuel lines, and a franchisor's failure to include such items in an offer to sell does not constitute a per se violation of the PMPA. *LCA Corp.*, 916

F.2d at 438. "Whether a particular offer to sell is bona fide must be decided on a case by case basis considering the offer as a whole and the purposes underlying the PMPA." *Id.* Moreover, several circuits have recognized that when underground fuel tanks may pose a threat to the environment, the PMPA does not require a franchisor to include them in an offer to sell. *Id.* at 438–439; *Ellis*, 969 F.2d at 787; *Tobias*, 782 F.2d at 1175.

*Second*, based upon the testimony presented at the oral and evidentiary hearing, the Court finds that the Plaintiff's purchase of the existing underground tanks would raise legitimate environmental concerns and would cause Equilon reasonably to fear future liability. Although the fiberglass tanks at issue recently passed an inspection, they are twenty-nine years old and have only a thirty-year warranty. (Tr. II at 77–78). Consequently, it is not unreasonable for Equilon to believe that the tanks are nearing the end of their useful life and to fear that they may leak in the relatively near future.[12] In reaching this conclusion, the Court also notes that Equilon is engaged in litigation with Owens–Corning, the manufacturer of the tanks, regarding their safety and viability.[13] (Tr. I at 134). Finally, the Court notes that Equilon would lose its ability to monitor the condition of the tanks upon their sale to the Plaintiff. As a result, the company would face the possibility of litigation and substantial clean-up costs, without retaining any control over the Plaintiff's maintenance or continued use of the tanks. In light of the foregoing considerations, the Court concludes that Equilon possessed several good reasons to insist upon the removal of the underground tanks. De-

---

**12.** Although the Plaintiff stresses that the tanks are made of fiberglass rather than steel, he does not suggest that they have an infinite useful life. Given that the manufacturer itself refuses to guarantee the tanks beyond thirty years, the Court finds it unreasonable to require Equilon to incur potential liability by selling the twenty-nine year old tanks to the Plaintiff.

**13.** Equilon representative Cortney Jenkins testified that the litigation concerns leaks in several of his company's Owens–Corning tanks. (Tr. II at 80). As a result, Equilon does not want to sell Owens–Corning tanks when it relinquishes a franchise. (*Id.*).

spite the Plaintiff's argument to the contrary, the Court also finds that the foregoing concerns are relevant to the issue of whether Equilon's refusal to sell the tanks rendered its offer not bona fide. Indeed, as noted above, several courts have recognized that the PMPA does not require a franchisor to sell underground tanks that pose a potential environmental hazard. *Ellis,* 969 F.2d at 787 n. 3 [14]; *LCA Corp.,* 916 F.2d at 438; *Tobias,* 782 F.2d at 1175.

*Third,* the Court finds immaterial the Plaintiff's argument that Equilon never offered to sell him the existing tanks. For the reasons set forth above, the company had good reasons for removing those tanks from the ground, and the PMPA did not require it to sell them to the Plaintiff. Additionally, the Court simply disagrees with the Plaintiff's argument that he "was never provided with an opportunity of purchasing new tanks from Defendant or a supplier that Defendant made arrangements with." Equilon's April 14, 1999, offer to the Plaintiff expressly states: "Purchaser may elect, at Purchaser's discretion and expense and by giving notice to Equilon prior to closing, to purchase new underground storage tanks and lines from a supplier arranged by Equilon at Equilon's price if available." (Def.Exh. F). In *LCA Corp.,* 916 F.2d at 436 n. 3, 438–439, the Eighth Circuit concluded that nearly identical language in a franchise sale offer satisfied the requirements of the PMPA.[15] Finally, the Plaintiff's argument that Equilon never "made arrangements

for new tanks to be installed" does not support the issuance of a preliminary injunction. Equilon never made arrangements for the installation of new tanks, because the Plaintiff never notified the company that he intended to take advantage of its tank offer. *Cf. id.* at 439.

*Fourth,* the Court does not dispute the Plaintiff's assertion that the value of the existing tanks was not deducted from Equilon's "total asking price of the property." This fact, however, does not support the issuance of a preliminary injunction. Notably, Equilon's "asking price" did not take into consideration the existing underground tanks. Consequently, when the company decided to remove the tanks, it had no reason to reduce its asking price. An independent appraiser determined the value of the real estate, and an Equilon engineer established a value for all improvements/equipment *except* the underground tanks, which were not part of the proposed sale.

*Fifth,* the Court finds unpersuasive the Plaintiff's attempt to distinguish *LCA Corp.,* 916 F.2d at 434, from the present case. That case bears substantial similarity to the present litigation. In *LCA Corp.,* the original franchisee assigned a service station franchise lease to the plaintiff, LCA, less than a year and a half before its expiration date. Shell subsequently informed LCA that it intended to sell the premises and non-renew the lease and dealer agreement.[16] *Id.* at 435. Shell

---

14. In *Ellis,* the Ninth Circuit recognized an "environmental exception" to the PMPA for "leaking tanks." In support of that exception, the court cited both *LCA Corp.,* 916 F.2d at 436, and *Tobias,* 782 F.2d at 1174. In those cases, however, nothing suggests that the underground tanks were actually "leaking." Rather, the franchisors feared exposure to liability if the tanks began to leak in the future. *LCA Corp.,* 916 F.2d at 436; *Tobias,* 782 F.2d at 1173. Consequently, the fact that Equilon has no evidence of a present leak in the Plaintiff's tanks is not dispositive.

15. The exact language of the offer made by defendant Shell Oil Company in *LCA Corp.* stated, in relevant part:

... Purchaser may elect, at Purchaser's sole discretion and expense and by giving notice to Shell prior to closing, to purchase new underground tanks and lines from a supplier arranged by Shell at Shell's price if available....

16. In *LCA Corp.,* the plaintiff assumed the lease with the understanding that Shell did not intend to renew the franchise agreement. *Id.* at 435. In the present case, the Plaintiff alleges that he lacked such knowledge when he received his assignment. The Court finds this distinction to be of little significance, however, because the dealer documents plainly put the Plaintiff on notice of Shell's right to non-renew the franchise agreement.

then offered to sell the premises to the plaintiff for $247,930. The offer included the land, improvements, and equipment. *Id.* at 436. To arrive at its asking price, Shell engaged in a process similar to that used by Equilon in the present case. The company obtained a "land only" appraisal of $190,000 from an independent real estate appraiser. A Shell engineer then established a value of $79,030 for all improvements and equipment, including the underground tanks and fuel lines. *Id.* The company combined the two valuations to arrive at an offering price of $269,030. Because Shell followed a nation-wide policy of removing its old underground tanks, however, the company refused to sell the tanks and fuel lines. Consequently, it deducted the $21,000 value of the existing tanks and lines from its asking price and offered the premises to the plaintiff for $247,930. The company also gave LCA the option of purchasing new tanks and lines from a supplier to be arranged by Shell. The terms of that option are nearly identical to the terms of the offer made by Equilon in the present case. *Id.* at n. 3. Upon review, the Eighth Circuit concluded that Shell's removal of the underground tanks did not violate the PMPA. The court also determined that the company's asking price approached fair market value and, therefore, did not violate the PMPA. *Id.* at 438–439.

In an effort to distinguish *LCA Corp.*, the Plaintiff contends that Equilon never provided him with an opportunity to purchase new tanks from a supplier to be arranged by the company. He also asserts that Equilon failed to deduct the value of the existing tanks from its asking price when it offered to sell him the premises. (Doc. # 33 at 12–13). Because the franchisor in *LCA Corp.* took both of these actions, the Plaintiff contends that the Eighth Circuit's ruling is distinguishable.

Upon review, however, the Court finds that the record belies the Plaintiff's argument. With respect to the first alleged distinction, Equilon *did* provide the Plaintiff with an opportunity to purchase new tanks from a supplier to be arranged by the company. In fact, the company's offer to assist the Plaintiff in procuring new tanks is almost identical to the offer made by the defendant in *LCA Corp.* (*See* Def. Exh. F. at Section 5). With respect to the Plaintiff's second argument, the Court does not dispute Equilon's failure to deduct the value of the existing tanks from its $294,712 asking price. Unlike the franchisor in *LCA Corp.*, however, Equilon never included the value of the tanks when it established an asking price for the premises. Rather, as noted above, it computed the value of the real estate, improvements, and equipment *without* assigning any value to the tanks. (Tr. at 101). Therefore, unlike the franchisor in *LCA Corp.*, Equilon had no reason to reduce the proposed sale price by the value of the underground tanks.

*Sixth*, the Court finds unpersuasive the Plaintiff's argument that Equilon and its parent corporation, Shell Oil, on prior occasions have failed to follow an alleged national policy of not selling underground fuel tanks. In his Memorandum, the Plaintiff suggests that the Defendant does not have a nation-wide policy of removing its underground fuel tanks. In support, he contends that two recent franchise sales included the underground fuel storage systems.[17] (Doc. # 33 at 13).

At the oral and evidentiary hearing, however, Equilon presented credible testimony explaining that the first sale did not include the underground tanks, and that the second transaction commenced before Equilon had developed and implemented a uniform national policy regarding the sale of underground tanks. Equilon representative J. Phillip Jensen testified that the

---

**17.** Elsewhere in his Memorandum, the Plaintiff suggests that the Defendant has failed to follow its national policy on three occasions. (Doc. # 33 at 17). As Equilon properly notes, however, the record does not disclose a third transaction.

first sale concerned an operating Shell station located at 2411 North Verity Parkway in Middletown, Ohio. (Tr. II at 37). That 1995 transaction was a land-only sale. The seller owned the land and conveyed it to a new owner. The transaction did not involve any underground tanks, because they are owned by Shell. (*Id.* at 40). Shell operates on the site pursuant to a lease from the current land owner, but the company owns the building, the underground storage tanks, and all aboveground improvements. (*Id.* at 38).[18] Given that the 1995 real estate sale to a private individual did not involve Shell's underground tanks, that sale could not have violated the company's national policy.

The second transaction cited by the Plaintiff involved a station located on North Main Street in Dayton, Ohio. In that transaction, the purchaser, Ken Hale, did obtain the existing underground fuel tanks from Shell. At the oral and evidentiary hearing, however, Equilon representative Thomas Gravlin explained the circumstances surrounding the transaction. Specifically, he testified that after Shell, Texaco, and Star Enterprises joined together in 1998 and formed Equilon, they decided to relinquish certain properties. (Tr. I at 135). At the time of Equilon's formation, Shell, Texaco, and Star Enterprises "had a little different view of how they were going to relinquish properties."[19] (*Id.* at 135, 139). Initially, Equilon established a policy of permitting underground tanks to be sold. (*Id.* at 135). That policy was in existence in late 1998,

when the company made an offer to Hale. (*Id.*). Shortly thereafter, Equilon changed its policy and decided that it would not sell old underground fuel tanks. Although the sale to Hale occurred in 1999, the company elected not to rescind its prior offer, which it had made in 1998, before the change in policy. (*Id.* at 135). As a result, Equilon essentially "grandfathered" the Hale transaction and permitted him to purchase the underground tanks. In the present case, however, Equilon's offer to the Plaintiff occurred after the implementation of its policy not to sell underground tanks. Consequently, the Court finds the Hale transaction to be distinguishable.[20]

For the reasons set forth above, the Court also finds that Equilon did not violate the PMPA by refusing to sell its underground storage tanks to the Plaintiff. In short, the Act imposed no per se obligation upon Equilon to sell the tanks, and the company offered to arrange for the Plaintiff to purchase new tanks at its cost. *Cf. LCA Corp.,* 916 F.2d at 438–439. Based upon the evidence before the Court, it perceives no "serious questions going to the merits" with respect to this issue. The record simply does not reflect that the Plaintiff has a "reasonable chance of success" on this issue. *Beachler,* 112 F.3d at 905; *Doebereiner,* 880 F.2d at 333; *Moody,* 734 F.2d at 1216.

■ The final inquiry, then, is whether Equilon's asking price for the Shell station was so excessive that it rendered the company's offer to sell not bona fide. "It is settled law that a bona fide offer under the

---

**18.** The Plaintiff's appraiser, Greg Corbolotti, admitted that he does not know whether Shell owns the improvements, equipment, and underground tanks at the site. (Tr. I at 87).

**19.** For example, Gravlin testified that Shell, one of the constituent entities of Equilon, has maintained a long-standing policy of not selling older underground fuel tanks. (Tr. I at 138–139). Presumably, the other two entities did not.

**20.** In any event, the existence or non-existence of a uniform national policy at Shell

and/or Equilon does not appear to be critical to the resolution of this litigation. Regardless of whether the Defendant never sells its underground tanks, it decided not to sell the twenty-nine-year-old tanks in this case. In its analysis, *supra,* the Court concluded that the company had several good reasons for electing not to sell those tanks. The Court also determined, under the facts of this case, that the PMPA does not compel Equilon to include them in its offer, regardless of what the company does in other transactions.

PMPA is measured by an objective market standard." *Ellis v. Mobil Oil,* 969 F.2d 784, 787 (9th Cir.1992). An objectively reasonable offer is one that approaches fair market value. *Id.; see also Rhodes v. Amoco Oil Co.,* 143 F.3d 1369, 1372 (10th Cir.1998); *LCA Corp. v. Shell Oil Co.,* 916 F.2d 434, 437 (8th Cir.1990); *Sandlin v. Texaco Refining and Marketing, Inc.,* 900 F.2d 1479, 1481 (10th Cir.1990); *Slatky v. Amoco Oil Co.,* 830 F.2d 476, 485 (3rd Cir.1987).[21] Given that "[t]here are many acceptable ways to appraise property," *Ellis,* 969 F.2d at 787 n. 4, "[t]here may be a range of prices with reasonable claims to being fair market value." *Slatky,* 830 F.2d at 485. Indeed, "the word 'value' almost always involves a conjecture, a guess, a prediction, a prophecy." *Id.,* quoting *Amerada Hess Corp. v. Commissioner,* 517 F.2d 75, 83 (3rd Cir.1975).

■ With these considerations in mind, the Court concludes that Equilon's offer to sell the real estate, improvements, and equipment (excluding underground fuel tanks) for $294,712 approached fair market value. Equilon arrived at this figure by obtaining an independent appraisal of the land alone, and by directing one of its engineers to determine the value of all improvements and equipment at the site (excluding the underground fuel tanks, which were not included in the proposed sale). At the oral and evidentiary hearing, Equilon presented testimony from Mark Middleton, the independent real estate appraiser, who initially valued the land alone at $160,000. After discovering that the property was larger than he originally believed, Middleton increased his land appraisal to $185,000. (Tr. I at 152–154).[22] The company also presented testimony from Equilon engineer Cortney Jenkins, who calculated the value of the improvements and equipment at the site. Using a spread sheet, Jenkins determined that a conservative estimate of the value of the improvements and equipment was $134,712.[23] (Tr. II at 72). He reached this conclusion by first visiting the site and reviewing the existing equipment and improvements.[24] He entered that informa-

**21.** Some courts also have inquired into whether the franchisor made its offer to sell in conformance with its general practices for selling property, and whether the franchisor sincerely believed that its offer represented fair market value. *See, e.g., Slatky,* 830 F.2d at 484; *Tobias v. Shell Oil Co.,* 782 F.2d 1172, 1174 (4th Cir.1986). In the present case, the evidence persuades the Court that Equilon has met these requirements. In reaching this conclusion, the Court finds credible and persuasive the testimony of Equilon representative J. Phillip Jensen, who testified about the procedure used to establish a selling price for the franchise at issue. In particular, Jensen testified that the company followed its standard procedure of hiring an outside appraiser to determine the value of the real estate and using one of its own engineers to determine the value of the improvements and equipment. (Tr. II at 31–36). Jensen testified that the company established its proposed selling price by calculating the sum of the real estate appraisal and the improvements/equipment valuation. (*Id.*). He also stated that Equilon uses this method throughout the country. (*Id.* at 32–33). Based upon Jensen's testimony, the Court finds that Equilon made its offer to the Plaintiff in conformance with its general practices for selling property. The Court also finds that the company sincerely believed its offer represented fair market value.

**22.** When determining the value of the land, Middleton utilized an appraisal technique known as the "direct sales comparison approach to value." (*Id.* I at 155).

**23.** Jenkins' $134,712 estimate did not assign any value to certain pieces of equipment, even though those pieces of equipment were included in Equilon's offer to the Plaintiff. For example, the proposed sale included a nearly new electronic leak detection device that Equilon had purchased for approximately $4,000. (Tr. II at 72–73). It also included leak sensors with a purchase price of approximately $3,000. (*Id.* at 73). Additionally, the proposed sale included a $13,254 fiberglass waste oil tank that had been installed in 1997. (*Id.* at 74; Def. Exh. J). Although Equilon's offer included each of the foregoing items, Jenkins did not assign any value to them when assessing the value of the equipment at the site. (Tr. II at 73: Def. Exh. J). As a result, Jenkins' computation appears to be a conservative one.

**24.** Jenkins has performed twenty to thirty such valuations in the past. (Tr. II at 66).

tion into a spread sheet prepared by Equilon. Using a formula designed by the company, Jenkins calculated the present value of the equipment and improvements by taking into consideration the age of the items, their replacement cost, their "useful life," and the applicable depreciation percentage.[25] By adding Middleton's initial land-only appraisal with Jenkins' valuation of the equipment and improvements ($160,000 + $134,712), Equilon established its asking price of $294,712.[26] This price included the real estate, as well as all improvements and equipment, except for the underground fuel tanks.

In opposition to Equilon's computations, the Plaintiff's appraiser, Greg Corbolotti, testified that the subject property had a fair market value of $264,000, with the underground fuel tanks included.[27] (Tr. I at 63, 74, 76). Without the tanks, Corbo-

lotti found that the fair market value would be reduced by $60,000 to $204,000.[28] (Tr. I at 97). He arrived at that value by using a direct sales comparison approach. Notably, however, his appraisal did not include any of the equipment at the site. For example, Corbolotti assigned no value to the lifts, compressors, and fuel dispensers. (*Id.* at 91–92). He made no attempt to place a value on any of the equipment, because he is not a "machine and equipment" appraiser. (*Id.* at 94). Corbolotti admitted, however, that those items would add some value to the property. (*Id.* at 93).

Even accepting Corbolotti's appraisal of $204,000 for the land, building, and site improvements, without the underground tanks, the Court concludes that Equilon's offer to sell "approached" fair market value.[29] The Court reaches this conclusion

**25.** Jenkins entered data onto the spread sheet, which determines the value of the equipment and improvements, based upon a formula established by other Equilon employees. (Tr. II at 85–86). Although Jenkins just "plugg[ed] . . . numbers" into a program, he testified that he was "comfortable" with the results based upon his experience. (*Id.* at 86).

**26.** As noted, *supra*, Middleton's $160,000 appraisal was based upon an incorrect site size. After determining the actual size of the site, Middleton increased his appraisal to $185,000. (Tr. II at 25). Equilon's offer to the Plaintiff, however, was based upon Middleton's initial $160,000 valuation. The fact that Equilon did not increase its asking price after Middleton increased his appraisal is strong evidence that the company made its offer to sell in good faith.

**27.** The Plaintiff's appraiser, Greg Corbolotti, prepared an expert report which indicated a value of $250,000. (Pl.Exh. 5). At the oral and evidentiary hearing, however, he made a recalculation and determined that the fair market value of the property is $264,000. (Tr. I at 62–63). The revision stemmed from Corbolotti's discovery that a comparable property had been sold without its underground fuel tanks. In his expert report, Corbolotti assumed that the comparable property had been sold *with* its underground fuel tanks. After discovering otherwise, Corbolotti modified his appraisal of the Plaintiff's property to $264,000. (*Id.* at 69).

**28.** Corbolotti actually told the Plaintiff that the value of the property without the underground tanks would be $190,000. He reached that figure by subtracting $60,000 from his original appraisal of $250,000, which had included the underground tanks included. (Tr. I at 97). As noted above, however, Corbolotti increased his appraisal to $264,000 at trial, after finding an error in his appraisal report. Subtracting the $60,000 from the corrected appraisal of $264,000 results in an appraised value of $204,000 without the tanks.

**29.** The Court notes, however, that Corbolotti's appraisal of $204,000 without the tanks is unreasonably low, even using his methodology. As set forth, *supra*, Corbolotti initially appraised the property at $250,000, with the underground tanks, and he subtracted $60,000 to account for Equilon's exclusion of the tanks. He arrived at this figure after reviewing the sales of four comparable sites. At the oral and evidentiary hearing, however, Corbolotti realized that he had mistakenly valued comparable number four as if the sale had included the underground fuel tanks. Upon discovering that comparable number four actually had been sold without the underground fuel tanks, Corbolotti revised his appraisal upward and determined that the Plaintiff's site was worth $264,000 with the fuel tanks or, implicitly, $204,000 without the tanks ($264,000—$60,000).

Notably, however, Corbolotti also appraised comparable number one as if that sale had

primarily based upon the recognized value of the equipment at the site. Although Corbolotti deemed himself unqualified to opine about the value of that equipment, he admitted that it had some worth. (Tr. I at 93, 102). The only evidence regarding the value of the equipment came from Equilon representative Cortney Jenkins.

As noted, *supra*, Jenkins identified a number of pieces of equipment which were included in the proposed sale to the Plaintiff. Those items included, *inter alia*, fuel island canopies valued by Jenkins at $43,992, modern gasoline dispensers valued at $21,120, a nearly new fiberglass waste oil tank valued at more than $10,000, and signs valued at $11,100. (Def. Exh. J; Tr. II at 74). According to Jenkins' estimate, the current value of these items alone exceeded $85,000. When the value of this equipment is added to Corbolotti's $204,000 appraisal for the real estate, building, and site improvements (not including the underground tanks), the result is a fair market value exceeding $289,000.[30]

Although Corbolotti challenges Equilon's valuation of the equipment, the Court concludes, at a minimum, that the company's estimate "approaches" fair market value. The Court reaches this conclusion for several reasons. *First*, Equilon representative Phillip Jensen testified that Jenkins employed a valuation procedure that has been used by Shell and Equilon for years in their commercial transactions. (Tr. II at 31–34). Of course, the fact that Jenkins used Equilon's traditional method of valuation does not necessarily mean that such a procedure resulted in a fair asking price. Jensen also testified, however, that the offer to the Plaintiff was consistent with "other similar dispositions" of service stations. (*Id.* at 37). This testimony was not controverted. *Second*, and perhaps more importantly, Equilon engineer Cortney Jenkins testified that his valuations are used to establish a selling price when existing equipment is removed and sold to contractors or brokers. (*Id.* at 60–61). This fact suggests that the values established by Jenkins were indeed fair and reasonable. *Third*, Jenkins testified that his estimate of the value of the gasoline dispensers was actually low. Although his valuation report indicated a replacement cost of $8,000 for each of the four dispensers, Jenkins stated that Equilon has purchased similar dispensers for $10,000 to $12,000 each. *Fourth*, the Court notes that the proposed sale included several other pieces of equipment: (1) an electronic leak detection device with a cost of $3,969; (2) liquid sensors that had cost

included the underground fuel storage tanks. In fact, he assumed that the transaction had included the tanks, the service station building, and "everything on site pretty much." (Tr. I at 66, 86). In its analysis, *supra*, however, the Court has credited the testimony of Equilon representative J. Phillip Jensen, who testified that the sale involving comparable number one was a "land-only" transaction. (Tr. II at 37–40). Jensen explained that Equilon still owns the building, improvements, equipment, and underground tanks at the location. (*Id.*). This fact has a significant impact upon the accuracy of Corbolotti's appraisal of the Plaintiff's service station. In his appraisal report, Corbolotti determined the value of the Plaintiff's station based largely upon his assumption that the $152,000 sale price for comparable number one had included the real estate, building, improvements, and underground tanks. In reality, that transaction included *only* the real estate. Equilon's offer to the Plaintiff, however, included the real estate, the service station building, site improvements, and all equipment (except for the underground tanks). Consequently, the Court concludes that Corbolotti's appraisal of the Plaintiff's property should be adjusted upward (as it was when he discovered that comparable number four was sold without the underground tanks) in order to account for the land-only nature of the transaction involving comparable number one. For purposes of its analysis herein, however, the Court has accepted Corbolotti's appraisal, because Equilon's offer "approaches" fair market value, even using his calculations.

**30.** Jenkins also valued the building and other site improvements at $58,000. (Def.Exh. J). For purposes of its computations, however, the Court has accepted Corbolotti's $204,000 appraisal of the real estate, building, and site improvements.

Equilon $2,994; (3) an automobile lift with a purchase price of $5,358; and (4) an air compressor with a purchase price of $1,408. (Tr. II at 73, 75). Several of these items were nearly new, and their combined purchase price exceeded $13,000. The Court finds that they added at least some additional value to the site. *Fifth,* the Court notes that the Eighth Circuit approved a nearly identical method of valuation (i.e. independent real estate appraisal + engineer's valuation of equipment and improvements) in *LCA Corp.,* 916 F.2d at 436.

In short, given that the Plaintiff's expert has valued the subject real estate, building, and site improvements at $204,000, the Court concludes that Equilon's asking price of $294,712, which included a substantial amount of equipment, approached fair market value, for purposes of the PMPA. As noted, *supra,* Equilon valued the canopies, fuel dispensers, waste oil tank, and signs alone at more than $85,000. For the reasons set forth above, the Court concludes that the company's valuation of that equipment is both fair and reasonable. Although the Plaintiff challenges Equilon's valuation, he has presented no evidence regarding the value of the equipment. In any event, even if the Court reduced Equilon's $85,000 valuation of its canopies, fuel dispensers, waste oil tank, and signs by fifty percent, it still would conclude that the company's offer "approached" fair market value, particularly in light of the other pieces of equipment included in the offer to sell.[31] Accordingly, the Court finds no serious questions going to the merits with respect to the bona fides of Equilon's offer. Consequently, the Plaintiff is not entitled to a preliminary injunction.

## C. *Balancing of the Hardships*

In the interest of completeness, the Court will address this factor, despite the absence of serious questions going to the

merits. As might be expected, this factor nearly always weighs in favor of a small franchisee rather than a large franchisor. *Barnes v. Gulf Oil Corp.,* 824 F.2d 300, 306 (4th Cir.1987). Indeed, "[a] franchisee's ability to demonstrate that he will incur the greater hardship should not be difficult in most PMPA cases[.]" *Khorenian v. Union Oil of California,* 761 F.2d 533, 535 (9th Cir.1985); *Ewing v. Amoco Oil Co.,* 823 F.2d 1432, 1436 (10th Cir.1987).

Upon review, the Court concludes that this factor weighs in favor of the Plaintiff. The issuance of a preliminary injunction would only require Equilon to maintain its relationship with the Plaintiff until the present lawsuit is resolved. On the other hand, the denial of a preliminary injunction would enable the company to displace the Plaintiff, thereby depriving him of an opportunity to earn a living through his business, if he elects not to purchase the property.

## D. *Conclusion*

Given the absence of serious questions going to the merits of the Plaintiff's PMPA claim, his Motion for a Preliminary Injunction (Doc. # 2) will be overruled.

## III. *Plaintiff's Motion for Leave to File an Amended Complaint (Doc. # 19)*

Also pending before the Court is a Motion for Leave to File an Amended Complaint (Doc. # 19), filed by the Plaintiff. In his Motion, the Plaintiff seeks leave to add claims against Equilon for fraud, misrepresentation, and promissory estoppel. In response, Equilon raises a "futility" argument, noting that leave to amend need not be granted if the proposed amendment would be futile. *See Fisher v. Roberts,* 125 F.3d 974, 978 (6th Cir.1997); *North American Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1284 (6th Cir.1997); *LRL Properties v. Portage Metro Housing Auth.,* 55 F.3d 1097, 1104 (6th Cir.1995). Specifically,

---

**31.** As noted above, those items included an electronic leak detection device, liquid sensors, an automobile lift, and an air compressor.

Equilon insists that the Plaintiff's proposed amendments are futile, because his claims are barred by the parol evidence rule and cannot withstand a motion to dismiss. After reviewing the parties' respective Memoranda, the Court finds Equilon's argument to be persuasive.

█ In support of his new claims, the Plaintiff alleges that he was induced to accept an assignment of the former franchisee's lease based upon fraud and misrepresentations made by Equilon. In particular, the Plaintiff alleges that Equilon representative Seth Heeren told him "that he would always have an operative gas station," that "it was standard policy to assume the agreement currently in effect," and that "at the expiration of the lease package [he] would execute a new five (5) year agreement." (Amended Complaint, attached to Doc. # 19 at ¶ 13); *see also Id.* at ¶ 45 ("Heeren conveyed to Harris that upon expiration of [former franchisee] Reed's current assumed lease, Defendant would execute per normal Shell policy a new binding five-year agreement with Plaintiff."). The Plaintiff also alleges that Heeren made his representation regarding renewal of the lease "with the intent of misleading Plaintiff into relying upon it." (*Id.* at ¶ 41). Finally, the Plaintiff asserts that he relied upon Heeren's statements when he accepted an assignment of the former franchisee's lease agreement. (*Id.* at ¶ 46).

Because Equilon ultimately elected not execute a new five-year agreement with the Plaintiff, he now seeks to assert his claims for fraud, misrepresentation, and promissory estoppel. The Court notes, however, that Heeren's alleged oral assurances about a five-year agreement contradict the express terms of the Plaintiff's written agreements. In a September 26, 1997, letter, Heeren consented to the assignment of a lease and "dealer agreement" by the former franchisee, John Reed, to the Plaintiff. (Pl.Exh. 1). Heeren's consent was subject to several terms and conditions, including the Plaintiff's agreement to be bound by the terms of certain "dealer documents." [32] (*Id.*). On September 29, 1997, the Plaintiff accepted Heeren's terms and conditions and agreed to be bound by the dealer documents. (*Id.* at 3). Those documents provide for the termination of his motor fuel station lease, his dealer agreement, and his auto care agreement on May 31, 1999. (Def. Exh. A at 1; Def. Exh. B at 1; Def. Exh. C at Article 2). They also state that neither party has an obligation to renew or continue the franchisor-franchisee relationship beyond its expiration date, and that the franchisor may nonrenew the agreement. (Def. Exh. A at Articles 10, 14; Def. Exh. B at Article 18.3, 23; Def. Exh. C at Article 13). Finally, the dealer documents contain integration clauses, indicating that those documents represent the complete and final agreement of the parties. (Def. Exh. A at Article 18; Def. Exh. B at Article 26; Def. Exh. C at Article 22).

After reviewing the contents of the foregoing documents, the Court concludes that they render the Plaintiff's proposed amendments futile. In his amended Com-

---

**32.** Those "dealer documents" include a motor fuel station lease, a dealer agreement, and an auto care agreement. (Def.Exh. A, B, C). Although these documents are not attached to the Plaintiff's proposed amended Complaint, they are relied upon and referenced therein, and they were introduced into evidence during the oral and evidentiary hearing on the Plaintiff's request for a preliminary injunction. (Tr. II at 104–105). Consequently, the Court may properly consider those documents when determining whether the Plaintiff's new claims are futile (i.e., whether they could withstand a Rule 12(b)(6) motion). Although

"[m]atters outside of the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss[,] . . . a defendant may introduce certain pertinent documents if the plaintiff fails to do so." *Weiner v. Klais and Co., Inc.,* 108 F.3d 86, 88–89 (6th Cir. 1997). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied." *Id.* at 89, citing *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993).

plaint, the Plaintiff alleges that Heeren made an oral representation that his lease would be renewed for a five-year period. He also alleges that he relied upon this representation when accepting an assignment of the prior franchisee's rights, duties, and obligations. Under Ohio law, however, the Plaintiff is precluded from relying upon prior or contemporaneous oral representations that vary or contradict the terms of his written agreements. *See, e.g., AmeriTrust Co. v. Murray,* 20 Ohio App.3d 333, 486 N.E.2d 180, 183 (8th Dist.1984); *Gerwin v. Clark,* 50 Ohio App.2d 331, 363 N.E.2d 602 (1977) (noting that "the parol evidence rule precludes the introduction of evidence of conversations or declarations which occur prior to or contemporaneous with a written contract and which attempt to vary or contradict terms contained in the writing"). This well recognized rule applies to each of the Plaintiff's proposed claims.

With respect to the fraud claim, an Ohio appellate court recently noted in *J.A. Industries, Inc. v. All American Plastics, Inc.,* 726 N.E.2d 1066, 133 Ohio App.3d 76 (1999), that "the parol evidence rule may apply to exclude evidence of fraudulent inducement in certain cases." Specifically, the court explained that " 'the law has not allowed parties to prove fraud by claiming that the inducement to enter into an agreement was a promise within the scope of the integrated agreement but which was not ultimately included in it.' " *Id.* at 1074, quoting *Busler v. D & H Manufacturing, Inc.,* 81 Ohio App.3d 385, 611 N.E.2d 352 (1992); *see also Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co.,* 10 F.Supp.2d 856, 878 (N.D.Ohio 1998) ("A party to a contract containing an integration clause may not assert a claim for fraud based upon promises extrinsic to the contract.").

Likewise, the parol evidence rule precludes the Plaintiff from recovering on his proposed misrepresentation and promissory estoppel claims. *See AmeriTrust Co. v. Murray,* 486 N.E.2d at 183 ("[A]ppellant cannot argue that he was the victim of ... misrepresentation when the terms of the written guaranty which he signed specifically refute that argument."); *Ed Schory & Sons, Inc. v. Soc. Natl. Bank,* 75 Ohio St.3d 433, 440, 662 N.E.2d 1074 (1996) (finding that the parol evidence rule prevented the plaintiff from prevailing on claims of misrepresentation and promissory estoppel).

In opposition to the foregoing conclusion, the Plaintiff insists that "[t]he Defendant raises ghost issues but cannot establish that amendment would be futile...." (Doc. # 27 at 4). The Plaintiff also reasons:

What the Defendant appears to argue is that prior to any discovery on the additional claims, no evidence exists to support their viability. The Defendant puts the cart before the horse.

(Doc. # 27 at 4).

Absent from the Plaintiff's Memorandum, however, is any explanation why Equilon's invocation of the parol evidence rule is a "ghost issue." Furthermore, Equilon's opposition to the Plaintiff's proposed amendment is not based upon a lack of evidence to support his claims. Rather, the company argues that the parol evidence rule precludes the Plaintiff from recovering on those claims, regardless of the evidence that he currently possesses or might unearth through discovery. In short, Equilon's position is that the Plaintiff cannot use any alleged prior or contemporaneous statements by Heeren to contradict or vary the terms of his assignment agreement and the dealer documents referenced therein. For the reasons set forth above, the Court finds this argument to be persuasive.[33] Accordingly, the Plain-

---

**33.** With respect to the Plaintiff's proposed fraud claim, Equilon raises an additional argument, contending that the claim is insufficiently pled. In support, the company first

notes that Heeren's alleged promises concerned the occurrence of a future event (i.e., the renewal of the Plaintiff's lease for a five-year term). Equilon then asserts that a fraud

tiff's Motion for Leave to File an Amended Complaint (Doc. # 19) is overruled, as futile.

### IV. Defendant's Motion in Limine (Doc. # 6)

Also pending before the Court is a Motion in Limine (Doc. # 6) filed by the Defendant. In its Motion, the Defendant seeks to exclude from trial any testimony or evidence regarding an extension of the Plaintiff's franchise lease agreement beyond its stated May 31, 1999, expiration date. Based upon the reasoning set forth, *supra,* in the Court's analysis of the Plaintiff's Motion for Leave to File an Amended Complaint, the Defendant's Motion in Limine (Doc. # 6) is sustained. The parol evidence rule prevents the Plaintiff from introducing evidence to vary or to contradict the terms of his written franchise documents.

### V. Conclusion

Based upon the foregoing analysis, the Plaintiff's Motion for a Preliminary Injunction (Doc. # 2) is overruled. The Plaintiff's Motion for Leave to File an Amended Complaint (Doc. # 19) is overruled. The Defendant's Motion in Limine (Doc. # 6) is sustained.

Counsel will take note that a telephone conference call has been set for March 24, 2000, at 8:40 a.m., to establish a new trial date and other dates leading to the resolution of this litigation.

claim cannot be predicated upon a promise concerning a future event, unless the promisor lacked the present intent to fulfill the promise when it was made. (Doc. # 24 at 4). Finally, Equilon contends that the Plaintiff's amended Complaint is devoid of any allegation that Heeren did not intend to renew the lease when he made his alleged promises. (*Id.*).Construed most strongly in favor of the Plaintiff, however, the amended Complaint adequately alleges that Heeren lacked any intent to honor his representation regarding the five-year renewal. Specifically, the Plaintiff alleges that "[t]he representation by Heeren was made with the intent of misleading Plaintiff into relying upon it." (Amended Complaint, attached to Doc. # 19 at ¶ 41). This allegation suggests that he never intended to honor his representation. Consequently, the Court finds Equilon's alternative argument unpersuasive. Nevertheless, for the reasons set forth more fully, *supra,* the Court concludes that the Plaintiff's pursuit of his proposed fraud claim would be futile.